## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                        No. CR 13-0559-002 JB

NESTOR VALDEZ a/k/a "Sarge,"

      Defendant.

### <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) Defendant Nestor Valdez' Sentencing Memorandum, filed September 24, 2013 (Doc. 72)("Valdez Memo."); and (ii) the United States' Objection to the Presentence Report and Response to Defendants [sic] Sentencing Memorandum, filed October 3, 2013 (Doc. 78)("U.S. Memo."). The Court held a sentencing hearing on October 4, 2013. The primary issues are: (i) whether the Court should apply adjustments for being a minor participant in criminal activity, possessing a dangerous weapon, both, or neither; and (ii) whether the Court should vary Defendant Nestor Valdez' United States Sentencing Guidelines ("U.S.S.G.") sentencing range downward to counteract the effects of the career-offender guideline. First, the Court agrees with Plaintiff United States of America that Valdez qualifies for the gun-possession enhancement and does not qualify for the minor-participant reduction, even though the Court's subsequent application of the career-offender enhancement renders these adjustments moot. Second, after carefully considering the factors enumerated in § 3553(a), the Court will vary Valdez' sentence downward somewhat to partially, but not totally, counteract the effects of the career-offender guideline; the Court concludes that strict application of the career-offender guideline would lead to "unwarranted sentencing disparities among

defendants with similar records who have been found guilty of similar conduct."   18 U.S.C. § 3553(a)(6).  Thus, although the Guidelines indicate a sentencing range of 188-235 months, the Court will impose a sentence of 96-months imprisonment, as well as four years of supervised release.

## FACTUAL BACKGROUND

The Court takes its facts from the Presentence Investigation Report, disclosed September 6, 2013 ("PSR"), that the United States Probation Office ("USPO") prepared.  On May 2, 2011, officers with the New Mexico State Police Department ("NMSPD") seized 298.1 grams of methamphetamine from an individual in the area around San Rafael, New Mexico and Grants, New Mexico.  See PSR ¶ 10, at 5.  The next day, NMSPD officers debriefed the individual from whom the drugs were seized and recruited him to be a confidential source ("CS1").  See PSR ¶ 11, at 5.  CS1 indicated that he was traveling from Phoenix, Arizona to San Rafael to deliver methamphetamine to five individuals, including co-Defendant Paul Barker.  See PSR ¶ 11, at 5. The NMSPD orchestrated a controlled delivery from CS1 to Barker; according to CS1, Barker was scheduled to receive 226.8 grams of methamphetamine from him, but, during a telephone with CS1 preceding the delivery, Barker increased the amount to 283.5 grams.  See PSR ¶ 11, at 6.  CS1 met with Barker and delivered the drugs in exchange for $11,600.00 in cash; Barker was arrested shortly afterward.  See PSR ¶ 11, at 6.

On May 9, 2011, law enforcement agents used a second confidential source ("CS2") to purchase heroin from an unknown dealer near San Rafael.  PSR ¶ 12, at 6.  Upon arrival at the arranged location, two individuals -- later identified as Valdez and co-Defendant Leena Martinez -- approached CS2.  See PSR ¶ 12, at 6.  CS2 advised the two that he was looking to buy heroin for his brother, and, in response, Valdez reached into his pants pocket and produced several

small bindles of heroin.  See PSR ¶ 12, at 6.  Valdez gave 0.7 gross grams -- later determined to be 0.5 net grams -- of heroin to CS2 in exchange for $40.00 in cash.  See PSR ¶ 12, at 6.  The next day, an undercover officer arranged another drug purchase from Valdez and Martinez, in which the officer paid $350.00 for 5.2 grams of heroin.  See PSR ¶ 13, at 6.  On May 14, 2012, an undercover officer arranged a purchase of 1.9 grams of methamphetamine for $350.00; on that occasion, Valdez left the area of the drug deal to meet with his source of supply.  See PSR ¶ 14, at 6.

On May 22, 2012, an undercover officer negotiated with Valdez and Martinez for the purchase of 2.2 grams of methamphetamine in exchange for $300.00.  See PSR ¶ 15, at 6.  Shortly after agreeing on the price, a white pickup truck arrived, and Martinez told the undercover officer that Barker was her and Valdez' source of supply.  See PSR ¶ 15, at 6.  Officers identified the individual driving the truck as Barker.  See PSR ¶ 15, at 6.  The undercover officer gave the cash to Martinez to give to Barker, and Valdez retrieved a bag containing the methamphetamine from Barker, which he then handed to the undercover officer.  See PSR ¶ 15, at 6.  The undercover officer conducted similar transactions -- with Barker participating indirectly in the transaction -- on May 31, 2012, and June 12, 2012, for 2.7 grams and 1.4 grams of methamphetamine, respectively.  See PSR ¶¶ 16-17, at 7.

During a purchase on July 3, 2012, Valdez advised the undercover officer that Barker would no longer be doing business with Valdez and Martinez; Valdez told the undercover officer that Barker was angry that the undercover officer was attempting to make contact with him.  See PSR ¶ 18, at 7.  Shortly afterward, a green Hyundai approached, and a female later identified as Marcela Camacho served as the source of supply for the transaction, providing 4.4 grams of methamphetamine in exchange for $560.00.  See PSR ¶ 18, at 7.  On August 7, 2012, undercover

officers purchased 2.1 grams of heroin from Valdez and Martinez in exchange for $100.00; no source of supply was involved in the transaction. See PSR ¶ 19, at 7.

On October 7, 2012, Valdez and Martinez were stopped in a motor vehicle for a routine traffic stop. See PSR ¶ 20, at 7. After the officer determined that the vehicle was registered to another person and neither occupant had any documentation regarding the vehicle, the officer sought and obtained consent to conduct a perimeter search of the vehicle using a drug-sniffing canine. See PSR ¶ 20, at 7-8. The canine alerted, and the subsequent search revealed a glass pipe with methamphetamine residue in it, several small baggies of marijuana, a clear baggie containing miscellaneous pills, and a .22-caliber pistol containing eight live rounds.[1] See PSR ¶ 20, at 8. The firearm was manufactured in Accokeek, Maryland, meaning that it had affected interstate commerce to get to New Mexico. See PSR ¶ 25, at 9. Officers arranged two more buys with Valdez and Martinez, on December 17, 2012, and January 11, 2013, for 5.3 grams and 1.5 grams of methamphetamine, respectively. See PSR ¶¶ 21-22, at 8. No source of supply was present at either meeting. See PSR ¶¶ 21-22, at 8.

On March 5, 2013, Drug Enforcement Administration ("DEA") agents obtained and executed arrest warrants on Valdez and Martinez. PSR ¶ 23, at 8. After being informed of and waiving his rights under Miranda v. Arizona, 384 U.S. 436 (1966), Valdez admitted that he dealt methamphetamine and heroin, and that he "usually sells up to . . . $100 worth." PSR ¶ 23, at 8. He told investigators that he profits roughly $20.00 for every $100.00 he sells, and that he and Martinez are both heroin addicts and use heroin twice daily. See PSR ¶ 23, at 8. Valdez stated that Barker had supplied him with methamphetamine in the past, but that they have not

---

[1]Because of the small quantities of drugs seized at the traffic stop, these drugs are not included in the overall drug weight totals that the PSR and this Memorandum Opinion and Order use. See PSR ¶ 20, at 8.

conducted business together in the past several months.  See PSR ¶ 23, at 8.  Four days later, while at the Torrance County (N.M.) Correctional Facility, Valdez was discovered to be in possession of heroin and cocaine, which he had smuggled into the jail in his rectum.  See PSR ¶ 24, at 8.

Valdez and Martinez "appear to be low-level drug dealers, selling narcotics for profit to support their own drug habit."  PSR ¶ 26, at 9.  Valdez and Martinez are considered low-level drug dealers, while Barker is a mid-level drug dealer.  See PSR ¶ 26, at 9.  In total, Valdez and Martinez are jointly responsible for the sale of 19.4 grams of methamphetamine and 7.8 grams of heroin.  See PSR ¶ 26, at 9.

Valdez' criminal history includes sentences for seven prior crimes: (i) an attempted burglary committed in 1983, at age nineteen, for which he received a sentence of three-years probation; (ii) a driving-while-intoxicated offense committed in 1988, at age twenty, for which he received one day of jail time; (iii) a possession-of-cocaine offense committed in 1989, at age twenty-five, for which he was sentenced to twenty-four-months imprisonment; (iv) a petty larceny committed in 1993, at age twenty-nine, for which he was sentenced to one day in jail; (v) trafficking-cocaine and unlawful-dealing-in-food-coupons offenses committed in 1993, at age twenty-nine, for which he was sentenced to four-years imprisonment; (vi) a distribution-of-marijuana offense committed in 2001, at age thirty-seven, for which he received eighteen-months imprisonment and one-year parole; and (vii) criminal trespass and larceny committed in 2007, at age forty-two, for which he received sixty-six months imprisonment and one-year parole.  See PSR ¶¶ 45-51, at 12-14.  Valdez was married to the same woman, Stella Valdez, for thirty years, and the couple have three adult children with whom Valdez stays in regular contact.  See PSR ¶ 66, at 17.

# PROCEDURAL BACKGROUND

Valdez pleaded guilty to conspiracy to possess with intent to sell 5 grams or more of methamphetamine pursuant to 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B), and distribution of methamphetamine and aiding and abetting pursuant to 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C). The former conviction carries a mandatory minimum of five years and a maximum sentence of forty years; the latter carries a maximum sentence of twenty years and no mandatory minimum.[2] Because it applies the career-offender guideline, the USPO calculates a final offense level of 31 and a criminal history category of VI, but, without the career-offender enhancement, the USPO states that Valdez' offense level would be 21 and his criminal history category would be IV, based on nine criminal-history points.  See PSR ¶¶ 32-42, at 10-11; id. ¶¶ 52-54, at 14.  The USPO asserts that, without the career-offender guideline, his base offense level is 24, see PSR ¶ 32, at 10 (citing U.S.S.G. § 2D1.1), he qualifies for a 2-level reduction for being a "minor participant" in the criminal activity, see PSR ¶ 36, at 11 (citing U.S.S.G. § 3B1.2(b)), he also qualifies for a 2-level enhancement for obstruction of justice, see PSR ¶ 37, at 11 (citing U.S.S.G. § 3C1.1), and, last, he merits a 3-level reduction for acceptance of responsibility, see PSR ¶¶ 40-41, at 11.  The USPO asserts, however, that under the career-offender guideline, his

---

[2]Penalties for drug conspiracies mirror those for commission of the substantive offense. See 21 U.S.C. § 846 ("Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.").

Had Valdez gone to trial, he would have been subject to much worse penalties, because his prior felony drug conviction would trigger a statutory sentence enhancement.  "If any person commits . . . a violation [of § 841(b)(1)(B) ] after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 10 years and not more than life imprisonment."  21 U.S.C. § 841(b)(1)(B)(viii).  To trigger this enhancement, however, the United States must establish the prior conviction, before the trial or guilty plea, by filing an information with the Court that the defendant could then affirm or deny.  See 21 U.S.C. § 851(a)(1).  The United States uses the discretion it has whether to file this information as a way to exercise leverage over the defendant in the plea-bargaining process.

offense level starts at 34, and is reduced only by the 3-level reduction for acceptance of responsibility.  See PSR ¶¶ 39-42, at 11.  The USPO asserts that Valdez is a career offender, because he has received two prior felony convictions for either crimes of violence or controlled substance violations -- namely, his 1994 cocaine-trafficking conviction and his 2001 distribution-of-marijuana conviction.  See PSR ¶ 39, at 11.  With the career-offender enhancement, Valdez' suggested sentencing range is 188-235 months; without the career-offender enhancement, his sentencing range would be 57-71 months.  See U.S.S.G. § 5A.

Valdez filed his sentencing memorandum on September 24, 2013, ultimately requesting a sentence at the statutory minimum of 60 months.  See Valdez Memo. ¶ B, at 3.  The Valdez Memo. is short.  Valdez does not contest any part of the PSR except for the USPO's statement that it has not identified any factors for potential departure or variance.  See Valdez Memo. ¶ 1, at 1 (citing PSR ¶¶ 93-94, at 21).  Valdez notes that the PSR states that he "'appear[s] to be [a] low-level drug dealer[], selling narcotics for profit to support [his] drug habit.'"  Valdez Memo. ¶ 2, at 1 (quoting PSR ¶ 26, at 9).  He asserts that Eric H. Holder, Jr., Attorney General of the United States, has discussed "[t]he concerns of sending garden variety drug addicts to long terms in prison," Valdez Memo. ¶ 4, at 2, and that, in his most recent prior conviction in 2007, the state district court took into account his drug addiction and sentenced him to 66-months imprisonment with fifty-percent credit for good time, see Valdez Memo. ¶ 3, at 1.

Primarily, Valdez asks the Court not to deem him a career offender under U.S.S.G. § 4B1.1.  See Valdez Memo. ¶¶ 5-7, at 2-3.  He argues that he, as a street-level drug dealer, is "low-hanging fruit for law enforcement."  Valdez Memo. ¶ 5, at 2 (quoting United States v. Vasquez, No. CR 09-0259 JG, 2010 WL 1257359, at *3 (E.D.N.Y. Mar. 30, 2010)).  See Valdez Memo. ¶ 7, at 3.  He cites, and attaches as an exhibit, an opinion that the Honorable Mark W.

Bennett, United States District Judge for the Northern District of Iowa, wrote in which Valdez asserts that Judge Bennett varied substantially below the indicated Guidelines range "because of the inequities of the career offender provisions."  Valdez Memo. ¶ 6, at 3 (citing United States v. Newhouse, 919 F. Supp. 2d 955 (N.D. Iowa 2013)(Bennett, J.)(attached as Doc. 72-1)).  Last, Valdez "asserts that a sixty-month sentence, the statutory minimum, would suffice to satisfy the relevant sentencing considerations in his case."  Valdez Memo. ¶ 7, at 3.

The United States submitted the U.S. Memo. less than two weeks later, both responding to the Valdez Memo. and making its own objection to the PSR.  See U.S. Memo. at 1.  It objects to the USPO's suggestion that the Court should apply the mitigating-role reduction for being a minor participant in criminal activity.  See U.S. Memo. at 2-3.  It asserts that the parties did not agree to such a reduction in the plea agreement and that Valdez' "statements to the undercover officer during the controlled buys that he received the drugs from Barker do not prove that he was a minor participant."  U.S. Memo. at 2.  It concedes that Valdez' relationship with Barker is "unclear," but that Valdez was always the undercover officer's point of contact to purchase drugs.  U.S. Memo. at 2.  It asserts that Valdez always had drugs on his person and that he was the one who negotiated the price of the drugs to be sold.  See U.S. Memo. at 2.  It also notes that Valdez was carrying a firearm at the time of his arrest, despite being a convicted felon, and the United States requests a 2-level enhancement on this ground.  See U.S. Memo. at 2.

In terms of responding to the Valdez Memo., the United States argues that, "[t]o not acknowledge his criminal history under the Career Offender portion of the Guidelines would not constitute a just sentence in this case."  U.S. Memo. at 4.  It asks, specifically, for the Court to impose a sentence above the range that Valdez would receive if the career-offender guideline did not exist, but below the range that the career-offender guideline indicates.  See U.S. Memo. at 5.

The United States asserts that a defendant's Guidelines range is, itself, a sentencing factor under 18 U.S.C. § 3553(a), and that district courts must "'begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.'"  U.S. Memo. at 5 (quoting Gall v. United States, 552 U.S. 38, 597 n.6 (2007)).  The United States posits that Valdez' "criminal history may be reasonably characterized as a shockingly long chain of criminal conduct which demonstrates a constant and total disregard for the law, disregard for the rights and safety of others, and an astonishing dedication to a life of crime."  U.S. Memo. at 5.  It also notes that, every time Valdez "received a significant sentence, he violated his sentence and his parole or probation was revoked."  U.S. Memo at 5-6.  The United States ultimately requests that the Court impose a sentence of 120 months, which it says the § 3553(a) factors justify, and is less than Valdez would receive upon conviction following a trial.  See U.S. Memo. at 6.

Valdez replied to the U.S. Memo. the next day.  See Reply to United States' Objection to the Resentence [sic] Report and Response to Defendant's Sentencing Memorandum [Doc 78], filed October 4, 2013 (Doc. 79)("Reply").  The Reply addresses the United States' objections to the PSR -- that the Court should remove the 2-level minor-participant reduction and impose a 2-level gun-possession enhancement -- in sequence.  Valdez appears to concede that the minor-participant enhancement is appropriate and asks the Court to depart downward on the ground that Valdez is a drug addict who deals only to fund his own habit.  See Reply ¶¶ 2-5, at 1-2.  The Court cannot tell if Valdez believes that the minor-participant reduction is factually inapplicable, see Reply ¶¶ 2-3, at 1-2,[3] but he acknowledges that, even if the reduction applies, the career-

---

[3]Valdez states that he "sees a problem with granting a minor role adjustment not because defendant as [sic] an addict who feeds his own addiction with low-level distribution."  Reply ¶ 2, at 1.  The Court cannot tell if this is a typographical error, or if Valdez is reversing on his prior contention that the minor-participant adjustment should apply.  The Court's confusion is compounded by the next sentence, in which Valdez states that the "Guidelines clearly envision

offender enhancement will render the minor-participant adjustment meaningless, see Reply ¶ 4, at 2 ("[T]he Tenth Circuit held that a career offender designation trumps any minor role adjustment. . . .  [The] Commission did not contemplate any minor role adjustment for . . . career offenders even if their role was minor.").  He thus asks that the Court, instead of applying the minor-participant reduction, grant "a downward variance in light of defendant's chronic addi[c]tion, low level drug convictions, sentences contemplated for equally or greater involved participants, and other sentencing considerations."  Reply ¶ 5, at 2.  Valdez asserts that, in United States v. Burgos, 518 F. App'x 728 (11th Cir. 2013)(unpublished), the United States Court of Appeals for the Eleventh Circuit "granted a 30 month downward variance because the participants were similarly situated but only defendant was facing a career-offender enhancement.  The court found unwarranted risk of sentencing disparities between relatively equally situated participants.  A variance was upheld as a reasonable exercise of the court's discretion."  Reply ¶ 5, at 2.

Valdez next addresses the United States' argument that the Court should apply a 2-level gun-possession enhancement.  See Reply ¶¶ 6-8, at 2-4.  Valdez argues that the enhancement does not apply, because the weapon lacked physical proximity to the drug offense, which Valdez says Tenth Circuit law requires.  See Reply ¶ 7, at 3 (citing United States v. Gomez-Arrellano, 5 F.3d 464, 466 (10th Cir. 1993); United States v. Smith, 131 F.3d 1392 (10th Cir. 1997); United States v. Roberts, 980 F.2d 645, 647 (10th Cir. 1992); United States v. Vaziri, 164 F.3d 556, 568 (10th Cir. 1999)).  Valdez contends that the test requires the United States to prove that he possessed the gun -- and possession can be proven by mere proximity to the offense -- and that,

_____

that the categories of 'minimal participant' and 'minor participant' will be applied to those involved in drug trafficking."  Reply ¶ 3, at 1.

even if the United States proves proximity, he can still avoid the enhancement by showing that "it is clearly improbable that the weapon was connected with the offense."   Reply ¶ 7, at 3 (quoting U.S.S.G. § 2D1.1 cmt. 3)(internal quotation marks omitted).   Valdez asserts that, although the gun was discovered, during the traffic stop, in proximity to some illegal drugs, that small quantity of drugs was for personal use.  See Reply ¶ 8, at 3-4.  He notes that the quantity of drugs discovered at the traffic stop is so small that the USPO does not even include it in determining the aggregate drug-weight totals.  See Reply ¶ 8, at 3-4 (citing PSR ¶ 20, at 8).  See also note 1, supra, at 4.

The Court held a sentencing hearing on October 4, 2013 -- the same day that Valdez filed his Reply.  See Transcript of Hearing (taken October 4, 2013)("Tr.").[4]  The hearing contained an extensive discussion whether Valdez qualifies for the minor-participant reduction, and even more about whether he deserves the gun-possession enhancement, despite that the parties, the Court, and the USPO all eventually agreed that the career-offender enhancement rendered those adjustments moot.  See Tr. at 10:12-24 (Court, Probation Officer, Aarons).  The United States elaborated on its argument that Valdez was not a minor participant: it opines that the USPO applies the adjustment based on Barker controlling Valdez' actions, which the United States asserts is not true.  See Tr. at 4:17-5:12 (Henderson).  The United States asserts that Valdez was merely a buyer of Barker's, that Valdez negotiated and conducted all of this own transactions, and that Valdez terminated the relationship with Barker when Valdez found "a new source of supply that has a better product than Barker."  Tr. at 5:9-10 (Henderson).  The United States asserts that only three people have been charged in connection with Valdez' criminal activity,

---

[4]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

but it suspected that there was a larger organization that extends into Mexico.  See Tr. at 6:5-23 (Henderson).  Valdez responded that Barker was the significant dealer, that Barker used Valdez for "protection" -- presumably meaning removal from the hand-to-hand deal, though it is not clear whether this word refers to protection from law enforcement or protection from robbery -- and that Barker was the one who terminated the relationship with Valdez.  See Tr. at 9:10-21 (Aarons).

The parties briefly discussed the career-offender enhancement, with Valdez conceding that the enhancement applies to him.  See Tr. at 39:11-40:3 (Aarons).  He asserts that, while he was surprised that a 1994 conviction would count as a qualifying conviction for career-offender purposes, "it's just under the 15-year rule[] . . . by a matter of months, because he was -- he violated [his parole]."  Tr. at 40:1-2 (Aarons).  Valdez continued to argue, throughout the hearing, that he was a low-level dealer who dealt drugs only to support his personal drug addiction; he also pointed out repeatedly that he has no violent history whatever in his criminal history.

The Court then imposed a sentence of 96-months imprisonment, to be followed by four years of supervised release.

> We often begin with the guidelines, and that may well be an appropriate place to begin here.  I guess when I looked at using the . . . guidelines as the base it seemed to me that there were about eight factors that put downward pressure on this sentence.  One is the nature of the defendant.  In this case being a street-level dealer. . . .  We're not dealing with someone that's at the top of . . . the organization. . . .  [W]hile I haven't given a minor role under the . . . guidelines, I do think that we can recognize what his role is in the drug world and also within the organization he played.  I don't think he's as serious a person as Barker.  I think he is more serious than Martinez, but not so greatly so that I can't recognize that he's not the . . . most significant drug dealer in the community or even within the organization.
>
> The lack of criminal behavior early on there was some property crimes, but as of late it seems to be drug crimes.

I think also the fact that he's barely a career offender counsels for some downward pressure here.

The fact that he's an addict is one of the over[whel]ming factors here because when I'm dealing with an addict . . . [and] I have to punish the crime, but I have to be careful that I don't use incarceration in any way to -- for rehabilitation purposes and that I can use rehabilitation purposes and supervised release to achieve those purposes.

There are some good qualities to Mr. V[aldez].  He does seem to have been able to work and have a . . . family and do some good things in life, but this addiction just overwhelmed him.  Also when I look at the nature of . . . the career offender [prior convictions] here, the offenses, we're not dealing with large amounts, so it does support and substantiate that we're dealing with relatively minor offenses throughout his life.  And there doesn't seem and that's not surprising given these are state offenses, that the . . . predicate acts here that he hasn't had any substantial treatment.  And so I think those are all factors that put downward pressure on it.

So if I start with the -- with the guideline range of []88 months and work downward from there I think we're going to get to the range that both the Government and the defendant are proposing.

. . . .

So I back that back down to maybe go from . . . 25 down to a 23, which puts you at a 70 to 87, but I do think that there needs to be some reflection here of the career offender.  It may not be and I don't think it should be as much as what the guidelines suggest, but backing that back up to a range of 24, 77 to 96 range, I think something the at the high end of that range is appropriate here.

And so I'm going to sentence Mr. Valdez to 96 months, which I think reflects well the seriousness of the offense.  I think it promote respect for the law, because I have tried very hard to reflect all the relevant factors in the sentence.  I think it provides a more just punishment, particularly given that we're dealing with somebody who is struggling with addiction.  I think it affords adequate deterrence, both at a specific and a general level.  And it protects the public.

While it is a tremendous variance, we're dealing almost with a 50-percent cut below the guideline range, I've tried to justify this as much as I can, and I think it avoids unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct.  And because I am able to use supervised release when you get out of prison, I think it will provide you with some of the education training and care you simply haven't had at this stage of your life to overcome these drug problems

- 13 -

Tr. at 51:14-53:3 (Court); id. at 55:20-56:18 (Court).

## LAW REGARDING THE GUIDELINES

In United States v. Booker, the Supreme Court severed the mandatory provisions from the Federal Sentencing Act, thus making Guidelines sentencing ranges effectively advisory. In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551. To achieve these purposes, 18 U.S.C. § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the

available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors enumerated in 18 U.S.C. § 3553(a), they are entitled to considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006).  This presumption, however, is an appellate presumption and not one that the trial court can or should apply.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91

(2007).  Instead, the trial court must undertake the § 3553(a) balancing of factors without any

presumption in favor of the advisory guideline sentence.  See Rita v. United States, 551 U.S. at

351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given
> the sentencing court discretion that it did not have earlier, the sentencing court's
> first task remains to accurately and correctly determine the advisory-guideline
> sentence.  Thus, before the sentencing court takes up a defendant's Booker
> arguments, the sentencing court must first determine whether the defendant is
> entitled to downward departures.  The sentencing court may, however, also use
> these same departure factors in the Booker calculus, even if the court does not
> grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb.

13, 2008)(Browning, J.).

## LAW REGARDING RELEVANT CONDUCT FOR SENTENCING

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of

conviction and all relevant conduct under [U.S.S.G.] § 1B1.3 (Relevant Conduct) unless a

different meaning is specified or is otherwise clear from the context."  U.S.S.G. § 1B1.1, cmt.

1(H).  In United States v. Booker, the Supreme Court noted:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity --
> depends for its success upon judicial efforts to determine, and to base punishment
> upon, the *real conduct* that underlies the crime of conviction.  That determination
> is particularly important in the federal system where crimes defined as, for
> example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of
> any article or commodity in commerce, by . . . extortion," . . . can encompass a
> vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)).  The Supreme Court's

reasoning in United States v. Booker suggests that the consideration of real conduct is necessary

to effectuate Congress' purpose in enacting the guidelines.

Section 1B1.3 provides that the base offense level under the guidelines "shall be

determined" based on the following:

(1)    (A)    all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B)    in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2)    solely with respect to offenses of a character for which [U.S.S.G.] § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3)    all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4)    any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4). The court may consider, as relevant conduct, actions that have not resulted in a conviction. Pursuant to the commentary to U.S.S.G. § 6A1.3, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct. The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard. See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.). Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)[5]("The

---

[5]United States v. Schmidt is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.

district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review.").  The evidence and information upon which the court relies, however, must have sufficient indicia of reliability.  See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct comes primarily from two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997).  In Witte v. United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double jeopardy challenge.  The defendant in Witte v. United States had been involved in an unsuccessful 1990 attempt to import marijuana and cocaine into the United States, and in a 1991 attempt to import marijuana.  See 515 U.S. at 392-93.  In March, 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's latter attempt to import narcotics.  See 515 U.S. at 392-93.  At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and therefore calculated the defendant's base

---

However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that United States v. Schmidt, United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished), and United States v. Leroy, 298 F. App'x 711 (10th Cir. 2008)(unpublished), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes. <u>See</u> 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with the 1990 activities. <u>See</u> 515 U.S. at 392-93. The defendant moved to dismiss the indictment, arguing that he had already been punished for the cocaine offenses, because the district court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense. <u>See</u> 515 U.S. at 395. The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments which the Double Jeopardy Clause of the Fifth Amendment to the Constitution provides. <u>See</u> 515 U.S. at 395. The United States Court of Appeals for the Fifth Circuit reversed the district court and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct." <u>United States v. Witte</u>, 25 F.3d 250, 258 (5th Cir. 1994). In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals, including the Tenth Circuit, that had previously considered this question. <u>See</u> 25 F.3d at 255 n.19 (citing <u>United States v. Koonce</u>, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the circuits and affirmed the Fifth Circuit. <u>See</u> 515 U.S. at 395. In finding that the district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted." 515 U.S. at 401. The Supreme Court reasoned that sentencing courts had always considered relevant conduct and "the fact that the sentencing process has become

more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  515 U.S. at 402.  Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity."  515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relied upon Witte v. United States' holding and upheld, against a double jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted.  In reaching its result in United States v. Watts, the Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the United States Court of Appeals for the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government establishes that conduct by a preponderance of the evidence.  See 519 U.S. at 149 (citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)).  The Supreme Court began its analysis in United States v. Watts with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.  See United States v. Watts, 519 U.S. at 151.  According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion."  United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit case law adheres closely to the Supreme Court's results in <u>Witte v. United States</u> and <u>United States v. Watts</u>.  <u>See</u> <u>United States v. Andrews</u>, 447 F.3d 806, 810 (10th Cir. 2006)(applying <u>Witte v. United States</u>' holding to affirm that a career offender enhancement does not violate the Double Jeopardy Clause of the Fifth Amendment).  In <u>United States v. Banda</u>, 168 F. App'x 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's argument that it was "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard."  168 F. App'x at 290.  The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment.  Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'"  168 F. App'x at 290 (quoting <u>United States v. Lauder</u>, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In <u>United States v. Coleman</u>, the defendant, Troy Coleman, appealed the district court's enhancement of his sentence for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute, but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime.  <u>See</u> 947 F.2d at 1428.  The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal of firearms charges.  <u>See</u> <u>United States v. Coleman</u>, 947 F.2d at 1428-29 (citing <u>United States v. Duncan</u>, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); <u>United States v. Rodriguez</u>, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add

at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing Coleman's sentence for possession of a firearm.  See United States v. Coleman, 947 F.2d at 1429.  The Tenth Circuit based its conclusion on evidence that: (i) two weapons had been located at the arrest scene; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved.  See 947 F.2d at 1429.  The Tenth Circuit summarized that, in reviewing federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted."  947 F.2d at 1429.

In United States v. Washington, 11 F.3d 1510 (10th Cir. 1993), the defendant, Patrick Washington, argued that the United States should prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence rather than by a preponderance of the evidence.  See 11 F.3d at 1512.  The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, and which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life.  The defendant argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required."  11 F.3d at 1515.  Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts

- 22 -

in the ordinary case to be proved by more than a preponderance standard."   11 F.3d at 1516

(citing McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)).[6]

## LAW REGARDING VARIANCES FROM THE GUIDELINES

After United States v. Booker, the sentencing guideline ranges are now advisory[7] and are

one of several factors set out in 18 U.S.C. § 3553(a).   Although appellate courts are allowed to

---

[6]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since classified its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013)(quoting United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)).   See United States v. Olsen, 519 F.3d at 1105 (affirming the preponderance of the evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)).   The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence.   See United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation); United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance of the evidence standard for facts that enhance a defendant's offense level by 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument).

[7]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the guideline ranges are advisory.   Gall v. United States, 522 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory[.]"); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").   The Court must consider the guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the guideline range, see Gall v. United States, 522 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").   The Court is not mandated, however, to apply a sentence within the calculated guideline range.   See United States

assume that within-guidelines sentences are reasonable, subject to rebuttal, see Gall v. United

States, 552 U.S. at 50-51, the Supreme Court has made it clear that no presumption of

v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

> The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

> . . . .

> The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted).  In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield.  In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances."  Irizarry v. United States, 553 U.S. 708, 710-16 (2008).  A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably.  See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence"  (emphasis added)).

United States v. Valdez, No. CR 10-1919-002, 2014 WL 3377695, at *20-21 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

reasonableness attaches at the district court level to the sentence that the Guidelines suggest, see Gall v. United States, 552 U.S. at 50 (explaining that a sentencing judge "may not presume that the Guidelines range is reasonable"); Rita v. United States, 551 U.S. at 351 ("In determining the merits of [the parties'] arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from further crimes of the defendant; and
>
> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).   Section 3553(a) also directs sentencing courts to consider: (i) the nature of the offense and the defendant's character; (ii) the available sentences; (iii) the sentencing guidelines and policy statements that the United States Sentencing Commission has promulgated; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

In Kimbrough v. United States, the Supreme Court stated that, in the ordinary case, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"  552 U.S. at 89 (quoting Rita v. United States, 551 U.S. at 350).  The Supreme Court recognized, however, that the sentencing judge is "in a superior position to find facts and judge their import under § 3553(a) in each particular

case." 552 U.S. at 89. Applying § 3553(a)'s factors, the Court has found that the case of an illegal immigrant who re-enters the United States so as to be able to provide for his two children and two siblings was not materially differentiated from other re-entry cases, and thus, no variance from the guidelines sentence was warranted. See United States v. Alemendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.). On the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although Jager's military service was not present to an unusual degree and thus did not warrant a departure, the Court found that a variance was appropriate, because Jager's military service was "superior and uniformly outstanding," as Jager appeared to have been "trustworthy[] and dedicated, and he served with distinction." 2011 WL 831279, at *14.

## ANALYSIS

The Court agrees with the United States on its arguments regarding adjustments for gun possession and being a minor participant in criminal activity: Valdez qualifies for the former and does not qualify for the latter. These adjustments are rendered academic, however, by the application of the career-offender enhancement. The Court will apply the career-offender enhancement and will not counteract its effects entirely by varying downward to a sentence within the Guidelines range that would apply but for the career-offender guideline. Congress, not merely the Commission, mandated the career-offender guideline, and the Court is thus inclined to honor it. The Court will, however, vary downward from the Guidelines range significantly, from a Guidelines range to 188-235 months to a final sentence of 96 months.

I.    **VALDEZ QUALIFIES FOR THE GUN-POSSESSION ENHANCEMENT AND DOES NOT QUALIFY FOR THE MINOR-PARTICIPANT REDUCTION, BUT NEITHER DETERMINATION HAS ANY IMPACT ON HIS GUIDELINES SENTENCING RANGE, BECAUSE THE CAREER-OFFENDER GUIDELINE SUBSUMES BOTH ADJUSTMENTS.**

Valdez qualifies for the gun-possession enhancement but not for the minor-participant reduction.  The gun-possession guideline requires only that, "[i]f a dangerous weapon (including a firearm) was underlined possessed, increase by 2 levels."  U.S.S.G. § 2D1.1(b)(1) (emphasis added).  The guideline's text makes clear defendant does not need to use, brandish, or discharge the weapon to receive the enhancement, and that mere possession is enough.  The gun possession does have to occur in the course of relevant conduct; the Tenth Circuit has repeatedly emphasized the undemanding nature of this standard: "[T]he government has the burden of proving merely that a weapon was present in some physical proximity to the offense. . . .  [T]he elements of the § 2D1.1(b)(1) enhancement do not require that the weapon be possessed in connection with the offense."  United States v. Gomez-Arrellano, 5 F.3d 464, 466 (10th Cir. 1993).  The Tenth Circuit recognizes, however, an exception to the enhancement, rooted in the guideline's commentary: "Once [the United States'] burden is met, . . . [the defendant must] demonstrate that it was 'clearly improbable' that the gun was connected to the offense."  United States v. Gomez-Arrellano, 5 F.3d at 466.  The United States Court of Appeals for the Sixth Circuit has stated:

> We have previously clarified that the government need not show that the defendant possessed the weapon during the *commission of the offense*; instead, it must show only that the weapon was possessed during "relevant conduct," which "includes 'all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction.'"

United States v. Finley, 239 F. App'x 248, 254 (6th Cir. 2007)(emphasis in original)(quoting United States v. Faison, 339 F.3d 518, 520 (6th Cir. 2003)).

Valdez' gun was found in close proximity to his offense of drug possession: he, the gun, his known drug-dealing partner, and the drugs were all found in the same vehicle.  See PSR ¶ 20, at 7-8.  Valdez argues that the drugs in the car were for personal use, see Reply ¶ 8, at 3-4, but the Court finds this contention unlikely, as there were at least four different drugs in the car, including marijuana that was stored in several separate baggies -- suggesting division for the purpose of sale, see PSR ¶ 20, at 8.  Valdez argues that the USPO's decision to not add those drug quantities to the total equates to a finding that those drugs were not possessed for future sale, see Reply ¶ 3-4 (citing PSR ¶ 20, at 8), but this decision was likely made (i) for convenience and (ii) because the additional weight would not have affected the outcome Guidelines range.  Moreover, even if Valdez' possession of these drugs somehow did not constitute the actual commission of this crime of conviction, it certainly constitutes relevant conduct.

Valdez likewise does not qualify for the minor-participant reduction.  This reduction is reserved for participants who are "substantially less culpable than the average participant." U.S.S.G. § 3B1.2 cmt. 3.  The commentary gives two illuminating examples of how courts should apply the adjustment:

> [A] defendant who is convicted of a drug trafficking offense, whose role in that offense was limited to transporting or storing drugs and who is accountable under 1.3 only for the quantity of drugs the defendant personally transported or stored is not precluded from consideration for an adjustment under this guideline.
>
> Likewise, a defendant who is accountable under § 1B1.3 for a loss amount under § 2B1.1 (Theft, Property Destruction, and Fraud) that greatly exceeds the defendant's personal gain from a fraud offense and who had limited knowledge of the scope of the scheme is not precluded from consideration for an adjustment under this guideline.  For example, a defendant in a health care fraud scheme, whose role in the scheme was limited to serving as a nominee owner and who received little personal gain relative to the loss amount, is not precluded from consideration for an adjustment under this guideline.

U.S.S.G. § 3B1.2 cmt. 3.

Valdez' role in the drug transactions was not "limited to transporting or storing drugs"; he arranged the transactions, negotiated the price, personally took the money and vended the drugs, and appeared to cultivate repeat customers.  See PSR ¶ 12-26, at 6-9.  He asserts that he profits approximately $20.00 for every $100.00 of drugs he sells, see PSR ¶ 26, at 9, but this share is likewise far from being only "accountable . . . for a[n ] amount . . . that greatly exceeds the defendant's personal gain" -- to the contrary, a twenty-percent profit margin seems like a reasonable rate of return for a "low-level drug dealer[]" without serious drug connections who buys his product from a mid-level dealer with such connections.  U.S.S.G. § 3B1.2 cmt. 3; PSR ¶ 26, at 9.  Valdez lacks the expertise, work ethic, or network to create the drugs, smuggle them into the country, or arrange for their complex distribution to dealers; he is paid primarily for being willing to incur an increased risk of arrest associated with the many street-level transactions in which he engages, and, to a lesser extent, for client development, marketing, and customer service.

Valdez does not qualify for a minor-participant adjustment.  The only reason the USPO initially applied the reduction was because it thought the United States and Valdez had jointly stipulated to it.  See PSR ¶ 6, at 5.  Given that the United States has not consented to the adjustment, see U.S. Memo. at 2, and that the adjustment is factually inapplicable, the Court will not grant Valdez the 2-level reduction.  Ultimately, the Court's rulings on these two adjustments are inconsequential, because the various guidelines must be applied in a specified order, and the career-offender guideline subsumes all chapter two and three adjustments.  For career offenders, the only factors that determine a defendant's Guidelines sentencing range are: (i) the maximum statutory sentence of the crime of conviction; and (ii) chapter 5 departures and the § 3E1.1

acceptance-of-responsibility adjustment.  See United States v. Jeppeson, 333 F.3d 1180 (10th Cir. 2003)(Kelly, J.); United States v. Nolf, No. CR 10-1919-2, 2014 WL 3377695, at *22-34 (D.N.M. June 20, 2014)(Browning, J.).  The Court may then vary from the Guidelines range under 18 U.S.C. § 3553(a).

## II.     THE COURT WILL APPLY THE CAREER-OFFENDER ENHANCEMENT, BUT WILL VARY DOWNWARDS FROM VALDEZ' FINAL GUIDELINES SENTENCING RANGE -- NOT OUT OF A GENERAL <u>KIMBROUGH</u> DISAGREEMENT WITH THE CAREER OFFENDER GUIDELINE, BUT BECAUSE THE COURT BELIEVES ITS APPLICATION DOES NOT COMPLY WITH 18 U.S.C. § 3553(a) IN THIS CASE.

The Court will apply the career-offender enhancement, because Valdez was convicted of two controlled substance felonies before this one.  The Court will not counteract the career-offender guideline -- at least not entirely -- by varying downward.  Although the Court is permitted to vary from the Guidelines for no other reason than having policy disagreements with the Guidelines -- these disagreements are known as Kimbrough disagreements, after Kimbrough v. United States, 552 U.S. 85, 101 (2007) -- the Court has no general Kimbrough disagreement with the career-offender enhancement.  Congress itself directed the Commission to create the career-offender guideline -- not with a broad, discretionary mandate like the ones it usually gives to the Commission and other administrative agencies, but with a highly specific statutory command, 28 U.S.C. § 994(h), that more-or-less mirrors the guideline.  The Commission's role in creating the career-offender guideline was more akin to taking dictation from Congress than it was to exercising congressionally granted discretion.  The Court is willing to have Kimbrough disagreements with the Guidelines when it concludes that the Commission has not properly executed Congress' will; the Court is reticent, however, to act on pure Kimbrough disagreements with Congress itself.  The Court will vary Valdez' sentence downward, however -- not on a general Kimbrough disagreement with the guideline, but based on the career-offender

enhancement's disproportionate impact in this case, and its failure to result in a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth" in § 3553(a). 18 U.S.C. § 3553(a).

### A. VALDEZ' GUIDELINES SENTENCING RANGE IS 188-235 MONTHS ON ACCOUNT OF THE CAREER-OFFENDER ENHANCEMENT.

To properly calculate Valdez' Guidelines sentencing range, the Court must apply the career-offender guideline to him. The career-offender guideline: (i) as codified in the Guideline, factually applies to Valdez, given his criminal history; (ii) was properly fashioned pursuant to a clear and direct congressional mandate, 28 U.S.C. § 994(h); and (iii) was intended to be binding upon district judges, albeit indirectly, because when Congress directed the Commission to create the career-offender guideline, the Guidelines were still mandatory. Although the Court may counteract the effects of what it considers to be an unfair application of the Guidelines by varying from their suggested sentencing range, the proper time to do so is after first calculating the proper Guidelines range.

The career-offender guideline provides as follows:

Career Offender

(a)     A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

(b)     Except as provided in subsection (c), if the offense level for a career offender from the table in this subsection is greater than the offense level otherwise applicable, the offense level from the table in this subsection shall apply. A career offender's criminal history category in every case under this subsection shall be Category VI.

Offense Statutory Maximum                          Offense Level

| (1) | Life | 37 |
| (2) | 25 years or more | 34 |
| (3) | 20 years or more, but less than 25 years | 32 |
| (4) | 15 years or more, but less than 20 years | 29 |
| (5) | 10 years or more, but less than 15 years | 24 |
| (6) | 5 years or more, but less than 10 years | 17 |
| (7) | More than 1 year, but less than 5 years | 12 |

*If an adjustment from § 3E1.1 (Acceptance of Responsibility) applies, decrease the offense level by the number of levels corresponding to that adjustment.

U.S.S.G. § 4B1.1 (emphasis omitted).   Valdez plainly satisfies § 4B1.1(a)'s criteria: he was forty-eight and forty-nine years old when he committed the crime of conviction; the crime of conviction here is a controlled substance felony; and Valdez has been convicted twice before this offense of controlled substance felonies -- in 2001 and 1994, with an additional stale conviction in 1990.  As such, Valdez does not dispute the mechanical applicability of the career-offender guideline to his case, but rather argues that applying the guideline results in unfairness in his case.

Although Valdez has not objected to the USPO's statement that he is a career offender, the Court will briefly conduct its own analysis to be sure.  For the career-offender enhancement to apply to Valdez, at least two of Valdez' prior convictions must: (i) be "controlled substance offense[s]"; (ii) be "felony convictions"; and (iii) not be time-barred.  Valdez' 1990 conviction is stale and does not count toward the two prior felony convictions required to be classified as a career offender; his 2001 and 1994 convictions, however, satisfy all three requirements, and Valdez is thus properly classified as a career offender.

Addressing the first requirement, the Guidelines define a "controlled substance offense" as any "offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled

substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or

dispense." U.S.S.G. § 4B1.2(b). Valdez' 2001, 1994, and 1990 convictions are for "Distribution

of Marijuana," "Trafficking Cocaine," and "Possession of Cocaine," respectively. PSR ¶ 47, at

12; id. ¶¶ 49-50, at 13.

> As for the second requirement,
>
> [t]he term "two prior felony convictions" means (1) the defendant committed the
> instant offense of conviction subsequent to sustaining at least two felony
> convictions of either a crime of violence or a controlled substance offense (i.e.,
> two felony convictions of a crime of violence, two felony convictions of a
> controlled substance offense, or one felony conviction of a crime of violence and
> one felony conviction of a controlled substance offense), and (2) the sentences for
> at least two of the aforementioned felony convictions are counted separately
> under the provisions of § 4A1.1(a), (b), or (c). The date that a defendant
> sustained a conviction shall be the date that the guilt of the defendant has been
> established, whether by guilty plea, trial, or plea of nolo contendere.

U.S.S.G. § 4B1.2(c). The commentary clarifies that a "'[p]rior felony conviction' means a prior

adult federal or state conviction for an offense punishable by death or imprisonment for a term

exceeding one year, regardless of whether such offense is specifically designated as a felony and

regardless of the actual sentence imposed." U.S.S.G. § 4B1.2 cmt. 1. The Tenth Circuit has

restricted this definition to a narrower swath of convictions than the Guidelines' text suggests:

"[I]n determining whether a state offense was punishable by a certain amount of imprisonment,

the maximum amount of prison time a *particular* defendant could have received controls, rather

than the amount of time the worst imaginable recidivist could have received." United States v.

Brooks, 751 F.3d 1204, 1213 (10th Cir. 2014)(Baldock, J.)(emphasis in original). The Court

need not dig this deep in analyzing Valdez' situation, however, because Valdez -- beyond simply

potentially facing a more-than-one-year sentence -- was sentenced to more than one year of

prison time for each conviction: eighteen months in 2001; four years in 1994; and twenty-four

months in 1990. See PSR ¶ 47, at 12; id. ¶¶ 49-50, at 13.

Turning to the third requirement, the career-offender guideline excludes stale convictions -- convictions more than fifteen years old -- from its requirement that the defendant have "two prior felony convictions."   U.S.S.G. § 4B1.1(a).   The commentary to the career-offender guideline provides that "[t]he provisions of § 4A1.2 (Definitions and Instructions for Computing Criminal History) are applicable to the counting of convictions" under the career-offender guideline.  U.S.S.G. § 4B1.2 cmt. 3.  The referenced § 4A1.2 provides:

> (1)    Any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted.   Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period.
>
> . . . .
>
> (3)    Any prior sentence not within the time periods specified above is not counted.

U.S.S.G. § 4A1.2(e).  Valdez' crime of conviction probably commenced on May 9, 2011, when officers first purchased drugs from him, see PSR ¶ 12, at 6, but, at the very latest, it commenced on March 5, 2013, the date of Valdez' arrest, see PSR ¶ 23, at 8.  Regardless of which date the Court uses, Valdez' 1990 conviction falls outside the fifteen-year lookback window, while his 1994 and 2001 convictions fall within it.  The 1994 conviction falls within the lookback window -- which, even giving Valdez the benefit of the later date of commencement for this crime of conviction, extends back to March 5, 1998 -- because his date of last release from custody was May 5, 1999.  See PSR ¶ 49, at 13.  Although it is true that Valdez was initially released on parole for his 1994 conviction on January 6, 1998 -- outside the lookback window -- the Tenth Circuit has held that incarceration for parole revocation counts as "being incarcerated during any part of such fifteen-year period."  U.S.S.G. § 4A1.2(e)(1).  See United States v. Patillar, 595 F.3d

1138, 1141 (10th Cir. 2010)(Hartz, J.)("If a defendant's probation was revoked and his total term of imprisonment exceeded one year and one month, the 'date of last release from incarceration on such sentence' determines whether his prior conviction falls within § 4A1.2(e)(1)'s window." (citing U.S.S.G. § 4A1.2(e)(1))).  See also U.S.S.G. § 4A1.2(k).

Because Valdez' crime of conviction carries a maximum sentence of forty-years imprisonment, his offense level under the career offender guideline is 34.  See U.S.S.G. § 4B1.1(b)(2).  Neither the gun-possession enhancement nor the minor-participant reduction is applied on top of the career-offender enhancement, see United States v. Jeppeson, 333 F.3d 1180 (10th Cir. 2003), but the 3-level acceptance-of-responsibility reduction applies, leaving Valdez with a final offense level of 31, see Order Granting Downward Adjustment in Defendant's Total Offense Level, filed October 15, 2013 (Doc. 88).   The career-offender enhancement automatically increases Valdez' criminal history category to VI, see U.S.S.G. § 4B1.1(b), which results in a sentencing range of 188-235 months, see U.S.S.G. § 5A.

**B.**    **THE COURT DOES NOT HAVE A GENERAL <u>KIMBROUGH</u> DISAGREEMENT WITH THE CAREER-OFFENDER GUIDELINE, BECAUSE -- WHILE IT MAY OR MAY NOT BE SOUND POLICY -- IN ENACTING IT, THE COMMISSION EFFECTUATED CONGRESS' UNAMBIGUOUSLY CLEAR INTENT.**

In 1984, Congress passed the Sentencing Reform Act -- the law that established the Commission, authorized the creation of the Guidelines, and enacted § 3553 -- with the express provision that the resulting Guidelines would be mandatory for district courts to follow.  See Pub. L. No. 98-473, 98 Stat. 1976.   Congress' broad directive to the Commission was to promulgate Guidelines that "provide[] certainty and fairness in sentencing and reduc[e] unwarranted sentence disparities," 28 U.S.C. § 994(f), by "develop[ing] means of measuring the degree to which the sentencing, penal, and correctional practices are effective in meeting the

purposes of sentencing," 28 U.S.C. § 991(b)(2).  Congress' expectation was not necessarily to

alter the average sentences then imposed, either generally or for any particular crime, but rather

to increase uniformity of sentencing.  See 28 U.S.C. § 994(m); S. Rep. No. 98-225 at 116.

Perhaps the clearest articulation of Congress' general directive to the Commission is that,

> as a starting point in its development of the initial sets of guidelines for particular
> categories of cases, the Commission [must] ascertain the average sentences
> imposed in such categories of cases prior to the creation of the Commission, and
> in cases involving sentences to terms of imprisonment, the length of such terms
> actually served.[8] The Commission shall not be bound by such average
> sentences, and shall independently develop a sentencing range that is consistent
> with the purposes of sentencing described in section 3553(a)(2) of title 18, United
> States Code.

28 U.S.C. § 994(m).  This subsection outlines the process that the Commission used, in general,

in constructing the Guidelines and defining the base offense level of various crimes.

This general directive is not, however, the only mandate that Congress gave the

Commission in § 994.  Subsection (h) provides separate, and far more specific, guidance:

> The Commission shall assure that the guidelines specify a sentence to a
> term of imprisonment at or near the maximum term authorized for categories of
> defendants in which the defendant is eighteen years old or older and --
>
> (1)    has been convicted of a felony that is --
>
> (A)    a crime of violence; or
>
> (B)    an offense described in section 401 of the
> Controlled Substances Act (21 U.S.C. 841),
> sections 1002(a), 1005, and 1009 of the
> Controlled Substances Import and Export
> Act (21 U.S.C. 952(a), 955, and 959), and
> chapter 705 of title 46; and

---

[8]The reference to "the length of such terms actually served" refers to the then-existing
institution of federal parole.  Another major feature of the Sentencing Reform Act was its
abolition of federal parole.  Pub. L. No. 98-473, 98 Stat. 1976.

(2)     has previously been convicted of two or more prior felonies, each of which is --

    (A)     a crime of violence; or

    (B)     an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and chapter 705 of title 46.

28 U.S.C. § 994(h).  It is pursuant to this directive -- not the general subsection (m) directive to examine past sentencing practices and codify them with alterations only as warranted -- that the Commission crafted the career-offender guideline.

The Court will apply the career-offender guideline, because failing to do so would defy not only the Commission's intent -- which is permissible now that the Guidelines are advisory -- but also that of Congress.  Although "the Guidelines are now advisory and . . . , as a general matter, courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," Kimbrough v. United States, 552 U.S. at 101 (last alteration in original)(internal quotation marks omitted), Congress' institutional primacy in the sentence-setting process remains unquestioned, even after United States v. Booker, see United States v. A.B., 529 F.3d 1275, 1281 (10th Cir. 2008)(Holmes, J.)("[N]othing in the reasoning of Booker expands the authority of a district court to sentence below a statutory minimum."  (quoting United States v. Williams, 474 F.3d 1130, 1132 (8th Cir. 2007))(internal quotation marks omitted)).  In short, Congress is entitled to set the substantive penalties associated with every federal crime.  While United States v. Booker bears on

procedure -- Congress may not set up different maximum or minimum[9] penalties to be triggered by anything other than a finding, by a jury, of proof beyond a reasonable doubt[10] -- it does not affect Congress' exclusive dominion over the substance of criminal sentences.

It is true that Congress' career-offender provision is a directive to the Commission, rather than a sentencing mandate to the courts, but Congress crafted § 994(h) in the same Act that authorized the creation of mandatory Guidelines and made them binding upon the courts.[11]  See

---

[9]Until recently, minimum sentences did not implicate the rule from Apprendi v. New Jersey at all.  In Harris v. United States, 536 U.S. 545 (2002), the Supreme Court upheld 18 U.S.C. § 924(c)(1)(A), which provides that, if a sentencing judge finds by a preponderance of the evidence that a defendant convicted of drug trafficking or a crime of violence had: (i) carried a firearm during the commission of the offense, then the minimum sentence the court may impose is five years, regardless whether the statute of conviction provides for a lower minimum; (ii) brandished a firearm, then the minimum sentence that the court may impose is seven years; and (iii) discharged a firearm, then the minimum sentence that the court may impose is ten years.  See 536 U.S. at 550-51.  The Supreme Court held that, although a fact must be proven beyond a reasonable doubt to a jury if it is to raise the maximum sentence that a defendant faces, judicial fact-finding may result in raising the mandatory minimum sentence without running afoul of the Sixth Amendment.  In Alleyne v. United States, 133 S. Ct. 2151, 2163 (2013), the Supreme Court overruled Harris v. United States, and held that a factual finding which will raise a defendant's minimum exposure must be made by a jury and found beyond a reasonable doubt.

[10]The fact of a prior criminal conviction is the sole exception to this rule: a defendant may be exposed to harsher maximum or minimum penalties on the basis of prior convictions, and a judge may find those convictions by a preponderance of the evidence.  See Apprendi v. New Jersey, 530 U.S. at 489-90; Almendarez-Torres v. United States, 523 U.S. 224 (1998).  As a result, the judicial findings necessary to trigger the career offender provision do not violate Apprendi v. New Jersey or United States v. Booker.

[11]There is nothing inherently unconstitutional about mandatory sentencing guidelines. Congress could still today set up a mandatory Guidelines regime; it is simply the case that any sentence-enhancement factors -- e.g., that the defendant was armed during the commission of the offense, that he was an organizer or manager, or that he abused a position of trust -- would have to be proven to a jury beyond a reasonable doubt.  Justices Stevens and Scalia preferred this remedy, but the majority of the Supreme Court elected to remedy the constitutional defect by continuing to allow a judge to find enhancements under a preponderance standard and by excising 18 U.S.C. § 3553(b)'s mandatory provision.  See United States v. Booker, 543 U.S. at 303-08.
    After Blakely v. Washington, 542 U.S. 296 (2004)(striking down the State of Washington's mandatory sentencing scheme based on judge-found facts as being in violation of the Sixth Amendment), and before United States v. Booker, the Court and the Honorable Bruce

18 U.S.C. § 3553(b)(1).   In short, Congress provided that district courts "shall" -- not "may" -- sentence career offenders to a term of imprisonment "at or near the maximum term authorized."   28 U.S.C. § 994(h) ("The Commission shall assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of defendants [meeting the career-offender criteria] . . . .").   The fact that Congress delivered this mandate to the Commission, rather than directly to the district courts, did not change that it was, at the time, binding upon the courts.   To ignore Congress' directive based on the fact that § 994(h) speaks to the Commission, and not to courts -- when doing either would have had the exact same effect in the pre-United States v. Booker era in which Congress passed it -- would be to nakedly substitute the Court's judgment for Congress' in an area -- constructing the elements of statutory crimes -- in which Congress has institutional competence and constitutional power. The Court declines this invitation.

To be clear, the Court understands that it can have a Kimbrough disagreement with any guideline, including the career-offender guideline.   What the Court is saying is that it does not have a Kimbrough disagreement with the career-offender guideline, because -- unlike most guidelines -- Congress personally fashioned its substance.   The career-offender guideline is the brainchild of Congress -- not the Commission -- and the Court views its role in sentencing as being the implementation of principles that Congress articulates.   This role is most directly realized with regard to the § 3553(a) factors -- which trump the Guidelines, are binding on courts, and, of course, which Congress can change at any time -- but the Court, in forming its

---

D. Black, United States District Judge for the District of New Mexico, submitted Guidelines enhancements to the jury, out of concern that an enhancement without the jury finding as fact the underlying conduct would render the Court's enhancement unconstitutional.   See United States v. Courtney, 960 F. Supp. 2d 1152, 1188 (D.N.M. 2013)(Browning, J.).

own policy objections pursuant to <u>Kimbrough v. United States</u>, will also consider § 994(h).  The Court's lack of a general <u>Kimbrough</u> disagreement with the career-offender guideline also does not mean that Court will never vary from a career-offender enhanced Guidelines sentencing range.  If the § 3553(a) factors demand it, the Court will vary.

    **C.    THE COURT WILL VARY VALDEZ' SENTENCE DOWNWARD TO 96-MONTHS IMPRISONMENT BASED ON THE FACTORS IN 18 U.S.C. § 3553(a).**

The Court will vary Valdez' sentence downward on the grounds that a 96-month sentence is "sufficient, but not greater than necessary, to comply with" the following purposes:

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

In fashioning a sentence that is sufficient but not greater than necessary to satisfy the § 3553(a) factors, the Court tested three distinct sentencing methodologies: (i) the Court's ordinary sentencing framework, which involves first calculating the Guidelines range and then identifying facts about Valdez and his conduct that apply upward or downward pressure on the Guidelines sentence; (ii) Valdez' requested approach, which involves sentencing him to the 60-month mandatory minimum on the basis that, under § 3553(a) alone, his sentence would be less than or equal to 60 months; and (iii) a hybrid approach, suggested in part by the United States in its proposal of a 120-month sentence, in which the Court calculates Valdez' sentence as it would be without the career-offender guideline, and then, after recognizing a limited number of factors

that put upward and downward pressure on the sentence, sentencing Valdez to the top of the new range -- instead of to the bottom of the range, as is the Court's usual practice -- to reflect his status as a career offender.  The Court concludes that the third model results in a sentence that most effectively promotes the § 3553(a) factors, and sentences Valdez under that model.

           **1.**        **The Court's Usual Sentencing Methodology Results in a 110-Month Sentence, and the Court Concludes That This Sentence Is Greater Than Necessary to Promote the § 3553(a) Factors.**

The Court's usual practice in sentencing defendants is to work outward -- usually downward -- from the defendant's Guidelines range, varying the defendant's offense level incrementally as the Court identifies factors that put downward and upward pressure on the sentence under § 3553(a).  When the Court runs out of sentencing factors, it uses the new offense level to calculate a "working" Guidelines range, and then sentences the defendant to the bottom of that range.  Here, the Court identifies eight factors that put downward pressure on the sentence.  First, Valdez' nature and his role in the offense -- while not so minor as to merit a mitigating-role adjustment under the Guidelines -- puts downward pressure on the sentence.  Valdez is a street-level dealer and is not someone at the top or a higher-up in a drug organization.  While the Court has not given him a mitigating role adjustment under the Guidelines, United States v. Booker gives the Court the ability to adjust a defendant's sentence based on roles that do not qualify for a formal Guidelines adjustment in either direction.

Valdez' role is less "serious" and warrants a lower level of "just punishment" than a more serious role would, and thus puts downward pressure on the sentence pursuant to § 3553(a)(2)(A).  Second, although Valdez is more culpable in this criminal enterprise than Martinez, he is less culpable than Barker, who appears to be the mastermind and primary profiteer among the three.  Valdez is not so much more culpable than Martinez that the Court

cannot also recognize that Valdez is not the most serious drug dealer in the group; Valdez is not as serious a criminal as Barker. Barker, however, is not a career offender, and he is thus subject to a lower Guidelines range than Valdez is. The Court concludes that the Valdez' relative culpability among the three offenders now before it -- all from the same drug operation -- puts downward pressure on the sentence. In addition to serving § 3553(a)(2)(A)'s mandate "to reflect the seriousness of the offense . . . and to provide just punishment," it also serves § 3553(a)(6)'s directive "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Third, Valdez' criminal history indicates a relative lack of variety in his criminal activities. Valdez has only been convicted of a small amount of property crime, and no violent crime; virtually all of his criminal activity has been drug related. The Court concludes that the narrow scope of Valdez' criminal activity puts downward pressure on the sentence. This factor follows § 3553(a)(1)'s requirement that the Court consider "the history and characteristics of the defendant." Fourth, Valdez is barely a career offender. That he is barely a career offender counsels for some downward pressure here. He has only two qualifying prior convictions -- the minimum number to receive the career-offender enhancement. Valdez would be subject to the same Guidelines range if he had three, four, or more qualifying convictions; that he has only two thus puts downward pressure on the sentence. This factor also serves § 3553(a)(1)'s mandate to consider "the history and characteristics of the defendant." Fifth, Valdez is a drug addict -- he is addicted to heroin and cocaine -- and much of his criminality stems from his addiction. That he is an addict is one of the most overwhelming and prominent § 3553(a) factors, because when the Court is dealing with an addict, it has to punish the crime, but it also has to be careful that it does not use incarceration in any way for drug-rehabilitation purposes. The most effective way to

reduce Valdez' criminal tendencies is to fix his drug addiction.  Incarceration is not an effective means to this end, and the Court cannot use imprisonment as drug rehabilitation.  See 18 U.S.C. § 3582(a) ("[I]mprisonment is not an appropriate means of promoting correction and rehabilitation."); United States v. Story, 635 F.3d 1241, 1247 (10th Cir. 2011)(Tymkovich, J.) ("We therefore agree with the Second, Third, Eleventh, and D.C. Circuits that § 3582(a) bars consideration of rehabilitation in setting a prison term absolutely.").  Valdez' drug addiction thus puts downward pressure on the sentence, both under § 3553(a)(1)'s directive to consider the "characteristics of the defendant," and § 3553(a)(3) and (a)(2)(D)'s mandate to consider "the kinds of sentences available" "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

Sixth, Valdez has some redeeming personal characteristics and good qualities; he was married to the same woman for thirty years, and Valdez and his ex-wife have three adult children with whom Valdez maintains a positive, close relationship.  He is able to work, has a good family, and has done some good in his life, but he has been overcome by addiction.  Under § 3553(a)(1)'s directive to consider the "characteristics of the defendant," this factor puts downward pressure on the sentence.  Seventh, in addition to Valdez having only two qualifying convictions, the nature of his qualifying offenses is relatively minor.  Only violent felonies and drug felonies count as qualifying convictions, and Valdez' qualifying convictions -- for trafficking cocaine in 1993 and for dealing marijuana in 2001, both involving relatively small drug quantities -- are among the less serious crimes that count as qualifying convictions.  Under § 3553(a)(1), which directs the Court to consider "the history and characteristics of the defendant," this factor puts downward pressure on the sentence.  Eighth, because Valdez' prior convictions have all been in the state system, Valdez has not yet been afforded any substantial

opportunity at drug rehabilitation.  That there does not seem to have been much help in the past is not surprising given that his past offenses were state offenses; states such as New Mexico have very limited prison resources, unlike the federal government, which can always print more money.  That Valdez has not previously tried and failed to get off drugs -- at least not with the aid of a structured program, such as the ones available in federal prison -- makes it more likely that a structured drug-rehabilitation program will work this time.  This factor thus serves § 3553(a)(3) and (a)(2)(D)'s mandate to consider "the kinds of sentences available" "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  Accordingly, the Court concludes that all of these factors put downward pressure on the Guidelines sentencing range.

The Court also points out a factor that it believes has no impact on the sentence, either upward or downward.  The Court has no <u>Kimbrough</u> disagreement with the career-offender enhancement.  The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa, has written that he has a "quasi-categorical policy disagreement with the Career Offender guidelines as applied to a low-level, non-violent drug addict."  <u>United States v. Newhouse</u>, 919 F. Supp. 2d 955, 990 (N.D. Iowa 2013).  The Court and Judge Bennett no doubt agree on some things and disagree greatly on some other things.  It is thus probably best for the Court to put its thoughts into its own words rather than copying someone else's.  The Court does not share Judge Bennett's <u>Kimbrough</u> disagreement with the career-offender enhancement.  The Court has no substantial disagreement with the Guidelines.  The career-offender enhancement is a societal tool to take those who continue to commit violent or drug crimes off the street.  It gives the prosecutor discretion to go after people who are engaged in recidivism, particularly on a large level.  On the other hand, federal judges also have been given tools at the sentencing stage to

ameliorate some of the enhancement's harsh consequences and to check potential misuses of discretion by prosecutors.  Hence, the Court does not have some of the great disagreements that Judge Bennett and others have with the career-offender enhancement and how it works, because federal sentencing judges have been given their own tools to counteract problems as they arise. The Court recognizes that the career-offender enhancement is used as a tool by the prosecutor to overwhelm the defendant into pleading guilty in some cases.  But the Court does not think that these criticisms undermine -- to a substantial degree, if any -- Congress' decision, which the Commission effectuated, that people who are career offenders should be somehow more harshly sentenced than other offenders, regardless of mitigating circumstances.

The Court also identifies two factors that put upward pressure on the sentence.  First, Valdez' most recent sentence was for 66 months, and that sentence failed to deter or rehabilitate him from committing this crime.  Section 3553(a)(2)(B)'s specific-deterrence requirement thus puts upward pressure on the sentence.  Second, Valdez has spent over fourteen-and-a-half years of his life[12] in various prison facilities, yet continues to engage in criminal acts.  A higher sentence may be needed both to effectuate § 3553(a)(2)(B)'s specific-deterrence factor and "to protect the public from further crimes of the defendant," as § 3553(a)(2)(C) requires.  This factor thus puts upward pressure on the sentence.

The two upward-pressure factors do not outweigh the eight downward-pressure factors, however, and, accordingly, the Court tentatively varies -- "tentatively," because the Court will test two other sentencing methodologies -- Valdez' offense level downward by 6 levels, to 25. This offense level indicates a working Guidelines range of 110-137, which, under the Court's

---

[12]This figure excludes the time Valdez has already served as a result of this crime, but includes stale convictions.  Excluding stale convictions and time served on this offense, Valdez has spent twelve-and-a-half years in prison.  <u>See</u> PSR ¶¶ 49-51, at 13-14.

usual practice of sentencing defendants to the low end of the range, results in a sentence of 110 months. So if the Court were to vary downward the equivalent of about 6 levels from 31, it would be landing at an effective Guidelines range of 110-137 months, which would support something along the lines of the United States' proposal, but is a little below the 120 months that the United States requests. Hence, if the Court starts with the bottom of the Guidelines range -- 188 months -- and works downward from there, the Court gets into a range that the United States is proposing, but that is still above that which Valdez is proposing. While the upward pressures do not outweigh the downward pressures, they do keep some upward pressure on the sentence -- above the statutory mandatory minimum. It also makes the Court comfortable in sentencing below the Guidelines range and below the sentence that the United States proposes that, even under its usual approach, the Court calculates a lower sentence for Valdez than the 120-month sentence that the United States recommends. In any case, the Court concludes that the Guidelines sentence is greater than necessary to effectuate the § 3553(a) factors -- indicating that, in this case, the Guidelines sentence is too far above a proper sentence under § 3553(a).

**2.      The Court Will Deny Valdez' Request That He Receive the 60-Month Mandatory-Minimum Sentence, Because This Sentence Is Inadequate to Satisfy the § 3553(a) Factors.**

Another way to deal with a high Guidelines sentence is to work off the baseline of the statutory minimum rather than with the Guidelines range. The Court finds this method difficult to use, because the statutory minimum is inappropriate for Valdez, given that he is a career offender, given his role in the offense and given his possession of the firearm. It is hard to work with the mandatory minimum as the minimum, particularly given the sentences that Valdez has received in the past and the cumulative amount of time he has spent in prison.

- 46 -

The Court considers but ultimately rejects Valdez' suggestion that the Court impose the 60-month mandatory minimum.  The Court is concerned that, in this case, as is generally the case when the Court is dealing with a career offender, it is dealing with a person who has not been deterred from criminal activity.  Although, as stated above, this crime is not the worst crime in the world, and Valdez' criminal history is relatively tame by career-offender standards, the ineffectiveness of Valdez' prior similar incarceration periods convinces the Court that it should not impose the minimum.  Valdez has spent over fourteen-and-a-half years of his life in various prison facilities, and his most recent sentence was 66 months -- six months longer than the sentence Valdez asks the Court to impose here.  See PSR ¶¶ 45-51, at 12-14.  Those sentences proved inadequate to serve § 3553(a)(2)(B)'s specific-deterrence consideration; they have thus far failed to deter Valdez from engaging in criminal conduct.  The Court is reluctant to go down to the level Valdez is proposing, largely because, from a specific-deterrence standpoint, some of the prior sentences have not worked, including some lengthy sentences.  As such, the Court concludes it must impose a sentence beyond the 60-month minimum.

### 3.        The Court Adopts a Hybrid Approach and Will Sentence Valdez to 96-Months Imprisonment.

Section 3553(a) demands a factually intensive examination of each defendant and each crime in order to tailor an individualized sentence that nonetheless avoids unwarranted disparities between similarly situated defendants.  In this way, United States v. Booker did not merely assign judges more power and more discretion; the case imparted judges with more responsibility to conduct careful, in-depth inquiries.  Section 3553(a)'s mandate sometimes requires courts to adopt innovative sentencing methodologies; consistency in sentences cannot come at the expense of cookie-cutter sentencing.  This case requires some deviation from the

Court's ordinary methodology, because, as the Court noted above, Valdez' Guidelines sentencing range is too far above his proper § 3553(a) sentence.

In this case, a better methodology may be one that is probably unique to this case, and finds its genesis in how the United States worked with the case to try to do justice. The Court concludes that the United States Attorney's Office came up with a framework that produces some promise for coming up with an appropriate sentence for Valdez, but which is still somewhat tethered to the Guidelines range and the policies within the Guidelines.

The Court has no <u>Kimbrough</u> disagreement with the career-offender guideline, but, in this case, the Court must mitigate the enormous impact it has on Valdez' Guidelines range to fashion a proper sentence. The Court will start with the United States' methodology and modify it with the Court's variance techniques. The Court will calculate Valdez sentence by: (i) undoing the career-offender enhancement's effect on Valdez' sentence by calculating the range that he would have received but for the career-offender guideline; (ii) conservatively varying from that offense level, considering only those factors that did not go into the Court's decision, in (i), to mitigate the career-offender enhancement's effects; and, last (iii) sentencing Valdez to the top of the resultant range, rather than the bottom, so that the career-offender guideline still has some impact on Valdez' sentence.

At the first step of this method, undoing the effects of the career-offender enhancement results in an offense level of 25 and a criminal history category of IV. If the Court starts or uses something an offense level of 25 and a criminal history category of IV -- as the United States does -- it is putting aside the career-offender status, at least for the moment. The Court makes this -- admittedly enormous -- variance to counter the career-offender guideline's otherwise excessive impact on Valdez' sentence. By "excessive" the Court does not mean "unfair"; it

means "greater than necessary[] to comply with the purposes set forth in [§ 3553(a)(2)]," and, thus, counter to law.  18 U.S.C. § 3553(a).  The Court notes several factors that render the career-offender enhancement's full effect excessive in this case: (i) Valdez' offense level, but for the career-offender enhancement, would be 25 -- six levels lower than he gets with the enhancement; (ii) Valdez' criminal history category, but for the career-offender enhancement, would be IV -- two categories lower than he is assigned under the enhancement; (iii) Valdez has only two qualifying prior convictions, the minimum number to receive the career-offender enhancement; (iv) Valdez' 1994 conviction -- without which he would not be a career offender -- is at most a few years from being stale, and thus uncountable for career-offender purposes; (v) all of Valdez' qualifying convictions, including this one, are for drugs, not violence, indicating that, while Valdez is a persistent drug offender, he appears to be nonviolent; (vi) Valdez appears to deal drugs to support his own habit, and does not appear to be profiting greatly, or to be linked to a sophisticated or violent criminal organization; and (vii) the United States suggests a sentence of 120 months -- a sentence well beneath the Guidelines range, and a sentence it chose because it is 15 months higher than the top of the Guidelines range that Valdez would receive but for the career-offender enhancement.[13]      Factors (i) through (iv) all relate to "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  The career-offender guideline is binary: a defendant either is or is not a career-offender, and there is no distinction -- indeed, no provision for different sentences, other than the sentencing court's post-United States v. Booker power to

---

[13]The United States said at the hearing that it based its recommendation on an offense level of 25 and a criminal history category of IV, see Tr. at 38:10-25 (Court, Henderson), which indicates a Guidelines range of 84-105 months, see U.S.S.G. § 5A, and then added 15 months on top of that to reflect Valdez' career-offender status, see Tr. at 38:10-25 (Court, Henderson).

vary from the Guidelines -- between a career offender with six relatively serious violent felonies and a defendant with two relatively innocuous drug felonies.  This binary nature creates an unwarranted uniformity in sentencing among dissimilar defendants, and it is the sentencing court's task under § 3553(a) to counteract this unwarranted uniformity to the extent possible.

Factors (v) and (vi) are relevant for several reasons.  First, once a defendant is classified as a career offender, the only factor that has any impact on the Guidelines sentence that he or she receives is the statutory maximum of his or her crime of conviction -- not his or her criminal history, the heinousness of the crime, the existence of and degree of harm to a victim, or any of the Chapter 2 and 3 factors that normally influence sentencing.  Drug offenses -- especially those not linked to organized crime -- are less "serious" and warrant a lower level of "just punishment" than violent offenses with identical, or even lower, statutory maximums.  18 U.S.C. § 3553(a)(2)(A).  For example, even a first-time offender convicted of possessing 1 gram of LSD[14] with intent to sell is subject to a maximum sentence of forty years, see 21 U.S.C. § 841(b)(1)(B)(v), (b)(1)(B)(viii), and a career offender convicted of possession of 1 gram of LSD would therefore have a Guidelines sentencing range of 262-327 months,[15] see U.S.S.G. § 4B1.1(b)(2) (providing that if the crime of conviction's statutory maximum is greater than 25 years but less than life, the offense level is 34); U.S.S.G. § 5A (providing that an offense level of 34 and a criminal history category of VI, which is automatic for career offenders, see U.S.S.G.

---

[14]LSD, or lysergic acid diethylamide, is a psychedelic drug colloquially known as "acid." Lysergic acid diethylamide, Wikipedia.org, http://en.wikipedia.org/wiki/Lysergic_acid_ diethylamide.

[15]The LSD-possessing career offender's sentence would be even higher if the United States were to file an information under 21 U.S.C. § 851(a)(1) formally informing the Court of the offender's prior convictions.  See note 2, supra, at 6.  This filing would increase the offender's statutory maximum from 40 years to life imprisonment, see 18 U.S.C. § 841(b)(1)(B)(v), (viii), and, accordingly, increase his or her Guidelines sentencing range to 360 months to life, see U.S.S.G. §§ 4B1.1(b)(1), 5A.

§ 4B1.1(b), indicates a sentencing range of 262-327 months in prison).  On the other hand, a

career offender convicted of voluntary manslaughter or of sexual abuse of a minor between 12

and 16 years old faces a statutory maximum of only 15 years, see 18 U.S.C. §§ 1112(b), 2243(a),

and thus has a Guidelines sentencing range of 151-188 months, see U.S.S.G. §§ 4B1.1(b)(4), 5A.

Even though most people consider a possessor of one gram of LSD to be less serious than a child

rapist or a manslaughter convict, the LSD possessor faces roughly 174% of the punishment of

the other two.  Even torture, which carries a maximum sentence of 20 years, see 18 U.S.C.

§ 234A(a), results in a career-offender sentencing range of 210-262 months, which is still well

below that of the single-gram LSD possessor, see U.S.S.G. §§ 4B1.1(b)(3), 5A.  The penalties

for LSD escalate at lower drug weights than any other drug, but the severe penalties are by no

means unique; the same forty-year maximum sentence applicable to a first-time, one-gram LSD

possessor also applies to first-time possessors of: 100 grams of heroin, 500 grams of cocaine,

twenty-eight grams of cocaine base, ten grams of phencyclidine (PCP), 100 kilograms of

marijuana, or five grams of methamphetamine.  See 21 U.S.C. § 841(b)(1)(B)(i)-(viii).

 Second, drug crimes have no specific "victim" to redress.[16]  18 U.S.C. § 3553(a)(7).

Third, the public requires less "protection" from drug offenders feeding their habit than from

---

[16]The Court must add a caveat to this statement.  The term "victimless crime" is a
misnomer as applied to any crime, including drug crime.  There are victims of drug crime.
Although it is sometimes said that society is the victim of drug crimes, this pat, somewhat
tautological explanation also fails to fully capture the situation.  This issue deserves a more
thorough, intellectually rigorous exposition -- for many reasons, not the least of which is that
Valdez will be spending many years in prison for his drug crime and deserves to understand
why.

 It is possible that Valdez' drug crimes have had few direct, negative effects on anyone in
particular -- although it is equally possible that, at some point, he led some of his clients into
addiction that affected their health or even caused their deaths.  What drug crime does, especially
in the aggregate, is impose monumental costs on society through indirect means.  Drug abuse is
to a society's health what cigarettes are to an individual's health: bad in every way.  Drug use is
strongly positively correlated with virtually every social evil, including violent crime, property

crime, sex offenses, prostitution, and fraud. See Fact Sheet: Drug Related Crime, United States Department of Justice Bureau of Justice Statistics (Sept. 1994), available at www.bjs.gov/content/pub/pdf/DRRC.PDF. Drugs reduce users' economic productivity, increase their dependence on welfare and other social services, and, of course, negatively affect their personal health. See Substance Abuse Treatment and Public Safety, Justice Policy Institute, available at www.justicepolicy.org/images/upload/08_01_rep_drugtx_ac-ps.pdf. Drug use destroys families -- the building blocks and "fundamental group unit[s] of society." Universal Declaration of Human Rights, art. 16, § 3. See Substance Abuse Treatment and Family Therapy, ch. 2, United States Department of Health and Human Services Substance Abuse and Mental Health Services Administration (2004). It threatens sovereign nations: the pseudo-corporate, pseudo-military enterprises that produce drugs and bring them into this country -- the cartels, which are fed by the American drug market -- murder thousands annually in Mexico and have corrupted, to an outrageous degree, the national government of one of the world's most populous nations. See Mexico Drug War Fast Facts, CNN World, http://www.cnn.com/2013/09/02/world/americas/mexico-drug-war-fast-facts ("More than 60,000 people have been killed from 2006 to 2012, according to the most recent data available from Human Rights Watch."); Colleen W. Cook, CSR Report for Congress (Oct. 16, 2007)("[N]early 1,500 of AFI's [the Federal Ministerial Police, f/k/a the Federal Investigative Agency, an agency founded to replace the Federal Judicial Police, which was disbanded after more than a fifth of its agents were arrested for connection to the drug cartels] 7,000 agents were under investigation for suspected criminal activity and 457 were facing charges."). Drug use in the United States has robbed the Mexican people of the confidence they should rightfully have in their elected government, rendered large portions of the Mexican countryside warzones, and seriously strained United States-Mexican diplomatic relations. See On the Trail of the Traffickers, The Economist (Mar. 5, 2009), available at http://www.economist.com/node/13234157 (mapping out the territories that the various cartels control); Mexicans Fear 'Losing' Country to Zetas Drug Cartel, CBC News, available at http://www.cbc.ca/news/world/mexicans-fear-losing-country-to-zetas-drug-cartel-1.1108266; Jose de Cordoba, Heads of U.S., Mexico to Meet as Tensions Rise, Wall St. J. (Mar. 3, 2011), available at http://www.wsj.com/articles/SB10001424052748703559604576176581941645712 ("President Felipe Calderon will meet in Washington on Thursday with President Barack Obama in an attempt to repair relations at a time when spiraling violence in Mexico's drug war has frayed ties between the two allies.").

Virtually no one argues that society is a better place because of the drug trade. Libertarians and other opponents of criminalizing drug use and the drug trade usually do so on the basis of the supposedly consensual nature of drug use. They argue that drug users are not hurting anyone but themselves by abusing drugs, and that drug deals are similarly consensual transactional relationships. They do not dispute the deleterious impact that drugs have on the user's physical health -- as doing so would destroy their credibility -- but, rather, they argue that an individual has the right to control and even ruin his or her own body. They often draw parallels between drug use and other, legal, self-harming or risky behavior, such as alcohol use, gambling, or overeating. They do not dispute the link that drugs have with Mexican violence and corruption, but, rather, they go on the offensive, suggesting that if drugs were legalized then their production would be taken over by legitimate corporate entities, who could presumably handle production more efficiently than the cartels. As for the link between drugs and street crime domestically, they argue on two separate fronts, one statistical and one philosophical.

First, they argue that current statistics overstate the link between drug use and criminality. They say that, because drug use and drug dealing have been criminalized, only individuals already predisposed to criminality are likely to engage in it. Even worse, they say, individuals who are not predisposed to criminality, but nonetheless become involved with drugs, may then become more inclined to develop other criminal tendencies, having dipped their toes into the water of pleasurable (for drug use) or lucrative (for drug dealing) criminal activity. Second, they argue that it is wrong to punish a person for anything other than the "final step" of an activity that harms another person. They say that when a methamphetamine user murders a police officer, society should punish only the murder, and not the drug use, even if the user would not have committed the murder but for the drug use; to do otherwise, they argue, would be to punish perfectly innocent drug use that does not lead to violent behavior. Under their rationale, punishing drug dealers is even more unfair than punishing drug users, because the user's criminal behavior -- in addition to being far from certain to transpire -- is an intervening cause, which should cut off the dealer's liability.

Courts do not often take the time to defend the United States' drug laws against such fundamental criticisms -- after all, the anti-drug position is presently the law, and it is far more fun to criticize the law than to defend it -- but, as understandable frustration with the war on drugs wears on the public and the libertarian position becomes more vogue, the Court feels it should respond to these arguments. First, the Court is not sure if consent truly exists -- and, if it does, whether it should carry the legal weight that the law affords to consent in other contexts -- with regard to an addict's decision, or compulsion, to feed his or her addiction. The Court sees defendants regularly, like Valdez, who are aware of the harm that their addiction is causing them, and are fighting with everything they have to quit using drugs. The Court does not completely excuse an addict's culpability in his or her own addiction, but to say that an addict's continued drug use is consensual -- in the way that buying a home or agreeing to engage in a boxing match is -- is not only unfair, but inaccurate, as well.

Second, evidence indicates that the link between drugs and other crime is causal, and not merely correlative. See Robert MacCoun, Beau Kilmer & Peter Reuter, Research on Drugs-Crime Linkages: The Next Generation, United States Department of Justice National Institute of Justice (July 2003), available at https://www.ncjrs.gov/pdffiles1/nij/194616c.pdf. To the extent that drug use -- and, by extension, drug dealing -- increases the probability that the user will commit a crime against, or otherwise harm, another individual, American drug laws rightfully punish users and pushers for this increased risk. In this way, drug laws are no different than other criminal laws that punish offenders for behavior that does not, in and of itself, harm another person, but that involves a reckless disregard for the health and safety of others. See Black's Law Dictionary 1385 (9th ed. 2009)(defining "recklessness" as "[c]onduct whereby the actor does not desire harmful consequence but nonetheless foresees the possibility and consciously takes the risk"). Driving while intoxicated, discharging firearms within a densely populated area, and transporting corrosive chemicals without taking proper safety precautions are all examples of behavior that is criminalized, despite that it does not necessarily harm anyone, because of the increased risk it creates to those around the offender. None of this is to say that, because a predicate act, i.e., drug use or drug dealing, increases the likelihood of a potentially consequent crime, e.g., a drug-fueled murder or act of domestic violence, the user or dealer should be punished for the full measure of the consequent crime. Drug users should not be, and are not, punished for crimes that they have not yet committed; federal courts rarely see use-only

- 53 -

or simple-possession crimes, and those crimes are not punished nearly as severely as the violent crimes and property crimes to which, if left unchecked, these drug crimes often lead.

Drug dealers do, however, receive stiff sentences which sometimes rival those of violent criminals. There are several reasons that the drug laws punish drug selling more severely than drug using. First, drug dealers multiply the increased risk of subsequent crime by the number of clients to whom they deal drugs. Second, once society has decided that it wishes to rout out the drug trade, it is a more effective strategy to go after the relatively small number of individuals involved in the supply chain than it is to go after the much larger number of users, many of whom have chemical drug addictions that overcome any deterrence that the drug laws create. Enforcement resources can be focused more effectively on the supply side of the drug market than the demand side. Third, drug dealers commit their crimes to make a profit, a motive that is perhaps more insidious than feeding an addiction, and criminal-justice deterrence is more likely to dissuade a profit-motive crime than an addiction-fueled crime. Fourth, drug dealers are higher on the long chain from street-level drug user to Mexican cartel, and thus more culpable for the large-scale evils of the drug trade.

As for the argument that legalization of drugs would kill the drug cartels, rendering them unable to compete against the efficient global corporations that would presumably take up the banner of the drug trade, the Court concludes that this prediction is speculative. First, only complete legalization -- not mere decriminalization -- would permit legitimate business entities to engage in drug production. Second, and more important, even if the libertarians are right, and legalization would cause legal businesses to edge the cartels out of the drug trade, the Court doubts that the cartels will simply disappear. Los Zetas, the largest Mexican drug cartel by territory, make a majority of their revenue from activities other than the drug trade, namely domestic terrorism coupled with large-scale extortion. See A Profile of Los Zetas: Mexico's Second Most Powerful Drug Cartel, Combating Terrorism Center (Feb. 16, 2012), https://www.ctc.usma.edu/posts/a-profile-of-los-zetas-mexicos-second-most-powerful-drug-cartel ("Los Zetas was never centrally focused on drug trafficking, although it has always been a part of the organization's business portfolio."). The cartels are, at base, organized crime groups -- not unlike the American mafia, but with a paramilitary bent. If they are edged out of the drug trade, the Court thinks it far more likely that they will focus more heavily on their other illegal activities -- which involve even more direct, brutal violence than the drug trade -- than it is that they will return to their homes and learn to farm or fix cars. Starving the cartels of drug money would undoubtedly weaken them, but the Court doubts they would go away entirely, and, in the short run, they may become even more violent.

Last, the Court notes that the United States is not and never has been a rigidly libertarian government, and, although the Court has no categorical aversion to piecemeal libertarian policies, it notes that sometimes, to obtain the purported benefits of libertarian philosophy, an entire "package" of libertarian policies must be adopted, i.e., just because legislation $A + B$ produces optimal outcomes does not mean than adopting either $A$ or $B$ without the other will improve outcomes. American society and policy are simultaneously both too puritanical and too liberal for legalizing drugs to have the benefits that libertarians tout. For example, the libertarian position is that, to the extent that drug use harms the user's personal heath, that effect impacts only the user, and no one else. This position assumes -- and the Court uses "assumes" in the economic sense of the word, i.e., where the assumer knows the assumption is false -- that society has no vested interest in the physical well-being of any one of its constituents. Now more than

---

ever, though, society, not the individual, foots the bill for healthcare.  See Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 ("Obamacare").   Even before Obamacare, society paid for the emergency care frequently necessitated by drug overdoses.  See Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd.  Even if society did not cover individual medical costs, however, Americans would still have a cognizable emotional interest in the physical health of their fellow citizens.  Most Americans would not want to live in a country in which their neighbors regularly suffer and die from avoidable, self-inflicted conditions, even if they did not have to pay for it through their taxes -- which they do.  Most Americans would prefer sacrificing a small, calculated quantum of liberty -- the freedom to partake in recreational drug use -- to avoid this result.  And Americans, through their elected representatives in Congress, have made that decision.  Thus, while in a completely libertarian society legal drug use acceptable, in a society like the United States', which is a welfare state, legalizing drug use and drug trafficking makes little sense.

At the end of the day, Americans use the democratic process -- not automatic adherence to substantive libertarian dogma -- to strike a balance between personal liberty and societal efficiency, and, given that drug use is not protected under the Constitution, efficiency alone justifies the proscription against drugs.  It is likely true that the United States could legalize drugs and either (i) tolerate the resulting increases in crime and decreases in public health, or (ii) make sacrifices elsewhere to offset the negative effects of legalized drug use, e.g., increasing spending on hospitals, police, or education, or banning other socially undesirable activities.  Americans have not chosen either of those paths, however, nor are they compelled to.  The most direct, most truthful answer to the question "why ban drugs but not cigarettes or alcohol" is "because Americans wanted to draw the line there."  This answer is not pat, as it may appear to be, nor does it reflect circular reasoning.  In the United States, the laws derive their authority from the process that creates them and not from their substantive features.  A democratic society is entitled to decide what level of collective health and safety it wants to have, and, in effectuating its decision, it must: (i) choose which activities to ban and which to allow -- drugs, alcohol, cigarettes, and prostitution are all unambiguously negative influences on health and safety, and while it may not be necessary to outlaw them all, legalizing them all would likely result in unacceptably low levels of health and safety; (ii) select a level and distribution of taxation -- higher taxes can fund programs that counter the negative effects of the activities in (i); and (iii) be willing to live with the results -- both in terms of health and safety, and the economy -- that follow from its choices in (i) and (ii).  That an ideologically pure libertarian may see little principled justification -- when examining the issue in artificial isolation -- for banning drugs but not cigarettes is irrelevant; Americans have decided that they do not want to live in a world with both.  There is, after all, no principled justification, in isolation, for banning driving on the left side of the road while allowing driving on the right.

In banning or severely restricting drug use, most other counties in the world join the United States -- at least with respect to hard drugs such as cocaine, heroin, and methamphetamine -- although, admittedly, sentences are harsher in the United States than in most other Western nations.     See Legal Status of Cocaine, Wikipedia.org, http://en.wikipedia.org/wiki/Legal_status_of_cocaine (aggregating legal sources from numerous nations); Legal Status of Methamphetamine, Wikipedia.org, http://en.wikipedia.org/wiki/Legal_status_of_methamphetamine; Heroin, Wikpedia.org, http://en.wikipedia.org/wiki/Heroin.  That many of these countries -- such as China, India, and those in the Middle East -- do not share the

violent offenders or cartel dealers.  This rationale is especially poignant given that Valdez' 1993

cocaine conviction is very old -- to the point of almost being time-barred -- and his 2001

conviction is for distribution of marijuana, a crime that may not be a crime by the time that

United States' ideological or cultural underpinnings suggests that American drug prohibition cannot be lightly chalked up to residual Puritan or Anglo-Saxon values, but, rather, that it is good, value-neutral policy.  Even American Indian tribes, which have recently been given the green light by the Department of Justice to grow and sell marijuana on their reservations -- providing them with potentially huge economic benefits, as reservations are often located in states that have not decriminalized marijuana -- are showing across-the-board reticence to legalize the drug for fear of promoting more substance abuse.  See Jeff Barnard, Tribes Wary of Growing, Selling Marijuana, Albuquerque J., Dec. 13, 2014, at C3.  Societies evolve in a similar manner to biological organisms, and that so many culturally and ideologically diverse societies have long-term drug-proscription policies indicates that such policies are probably helpful for societal survival and growth.

      Thus, when the Court writes that Valdez' crime has no specific victim, what the Court means is that the costs of Valdez' crime are spread out among all members of society.  The costs are not distributed equally among every citizen -- those in Valdez' neighborhood, and those in high-crime neighborhoods across the country, bear the brunt of the risks that Valdez and drug dealers like him present.  But, unlike, e.g., homicides and home burglaries, drug crimes do not necessarily ruin or even substantially affect any one person's life -- except perhaps the user's or dealer's family, and Valdez' family appears to be functional.  Society often intentionally seeks to spread what would otherwise be a catastrophic loss to an individual across society, most obviously through taxation, but also through such policies as imposing strict liability for manufacturing defects.  See, e.g., Escola v. Coca Cola Bottling Co. of Fresno, 150 P.2d 436 (Cal. 1944)(Traynor, J.)("The cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business."); Restatement (Second) of Torts § 402A cmt. c ("[P]ublic policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained . . . .").  That Valdez' crime includes loss-distribution as a built-in feature is a valid basis for, all other things being equal, treating crimes without a specific victim more leniently than those with a specific victim.  Sentencing considerations that apply in cases with specific victims -- such as demonstrating to a grieving family or an injured victim that justice is being done, wrong is being punished, and their voices are being heard -- do not apply in cases like Valdez'.  See 18 U.S.C. § 3553(a)(7) (directing courts to consider "the need to provide restitution to any victims of the offense").  Because so-called victimless crimes harm everyone, but cause pain to no one, society's indignation at these crimes is more remote, and the need for harsh punishment less pressing.  Drug crimes and other so-called victimless crimes do not, however, relieve the federal courts -- who are entrusted with faithfully applying the laws that Congress has passed and the President has signed -- of the duty to apply them as harshly as Congress -- the elected branch -- intended.

Valdez is released from prison on this offense.  18 U.S.C. § 3553(a)(2)(C) (referring to the need "to protect the public from further crimes of the defendant").  Fourth, and perhaps most important, the underlying causes of drug criminality may be more readily treated by alternatives to lengthy prison terms -- namely, shorter prison terms with intensive rehabilitation and vocational programs, and supervised release -- than the underlying causes of violent criminality or membership in a drug cartel, which can often only be confidently dealt with via imprisonment. See 18 U.S.C. § 3553(a)(2)(D) (referring to the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"); 18 U.S.C. § 3553(a)(3) (directing the sentencing court to consider "the kinds of sentences available"); 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.").

Factor (vii) -- that the United States suggests that the Court impose a sentence well below the Guidelines range -- does not neatly fit into any one § 3553(a) factor, but, in an adversarial system, when a party partially concedes an issue, bringing the parties into closer agreement than they would otherwise be, it is, more often than not, not for the Court to intercede and deny the concession.  This general principle is applicable to both criminal and civil cases.  Given that the party in question is the United States -- which, like the Court but unlike private parties, is vested with its own separate, independent constitutional authority to shape the fate of the defendant, including its unilateral authority to drop charges altogether -- the Court generally shows some deference to its requests for less incarceration.  After all, they are seeking justice, too. Nevertheless, it is the Court's duty, not the United States', to decide what the proper sentence should be.

At the second step of this method, the Court will apply incremental variances in the same way that it usually does.  The Court will take account of some of the factors that it mentioned in its traditional analysis.  The Court does not, however, think it can or should give them as much weight as it does in its usual methodology.  The Court should not put aside the career-offender enhancement and then vary as it normally would; that methodology would benefit Valdez too much, give no deference to the career-offender guideline, and would be too untethered from the Guidelines.  There are, however, two primary factors that put downward pressure on even the reduced range.  First, the kind of drug dealer that Valdez is continues to put downward pressure on the sentence even when the career-offender enhancement's effects are mitigated.  He is street-level dealer -- nothing more.  Second, the role of the firearm in this case -- which was minimal, even though it was enough to warrant the enhancement -- puts downward pressure on the sentence.  While the Court has concluded that Valdez deserves the two-level enhancement for possessing the firearm, Valdez does not appear to be a violent person.  So whether there is a great connection or a tenuous connection between the crime here and the firearm, Valdez has not displayed the tendency to use firearms in the past.  The Court will therefore vary downward two additional levels, to an offense level of 23, which indicates a sentencing range of 70-87 months.  This range reflects Valdez' role in the offense, which comes just short of a mitigating-role reduction, but does not give any further variance for: (i) Valdez' salutatory relationship with his long-time wife and three children; (ii) Valdez being addict, and the Court's inability to use incarceration as a form of drug rehabilitation; and (iii) Valdez not yet having had an opportunity to receive treatment in a structured environment.  These last three factors apply downward pressure on the sentence, but are at least partially offset by the fact that Valdez has been sentencing to lengthy prison terms before -- and over a decade in aggregate -- and still continues

to commit drug crimes.  The Court thinks there needs to be some additional punishment to reflect that Valdez is a career offender.  The enhancement should not be as much as what the Guidelines suggest, but the Court believes that it should add one offense level to its working offense level.  The Court will vary upward by one additional level, resulting in a working offense level of 24, which indicates a sentencing range of 77-96 months.  And so as not to discount the career-offender enhancement too much, the Court will sentence at the high end of the working range.  Sentencing at the high end of the working range is appropriate, because sentencing at the low end does not adequately serve the § 3553(a) factors.

At the third and final step, the Court will sentence Valdez to the top of the resultant sentencing range.  The Court uses the top of the range, because, if it were to use the bottom of the range, as it normally does, Valdez would receive little additional punishment for being a career offender.  Although the § 3553(a) factors demand that the career-offender enhancement's effects be severely mitigated in this case, the Court concludes it would lack due regard for congressional sentencing priorities for the Court to impose no additional punishment for being a career offender.  Given that the sentencing range for an offense level of 24 and a criminal history category of IV is 77-96 months, the Court will sentence Valdez to 96-months imprisonment.  The Court concludes that this sentence is "sufficient, but not greater than necessary, to comply with the purposes set forth in" § 3553(a)(2).  18 U.S.C. § 3553(a).

The Court will sentence Valdez to 96-months imprisonment, which still reflects well the offense's seriousness.  This sentence promotes respect for the law, because the Court has tried very hard to reflect all the § 3553(a) factors in the sentence.  The Court concludes that this sentence provides a more just sentence than the Guidelines sentence, particularly given that the Court is dealing with someone who is struggling with addiction.  The Court also concludes that

the sentence affords adequate deterrence, both at a specific and general level.[17]   It also protects

the public.

---

[17]The Court will briefly illustrate the need for general deterrence in drug crimes, using current numbers.  The Court will use cocaine as its example, as these figures are the most accessible.

At the wholesale end of the drug trade, an ordinary consumer -- i.e., no cartel ties are needed -- can buy a kilogram of pure cocaine in the Columbian interior for a little over $2,000.00, at Colombian port cities for around $6,000.00, in Mexico for around $12,000.00, and in the United States for around $25,500.00.  See Scott Stewart, Mexico's Cartels and the Economics of Cocaine, Stratfor Global Intelligence (Jan. 3, 2013), http://www.stratfor.com/ weekly/mexicos-cartels-and-economics-cocaine#axzz3LufJMqVY.   See also United Nations World Drug Report 2007 § 3.4.2, available at https://www.unodc.org/pdf/research/wdr07/WDR_ 2007_3.4.2_cocaine.pdf (listing the 2005 U.S. wholesale price of a kilogram of cocaine as $20,500.00).  At the retail end of the drug trade, a gram of cocaine -- the typical street-level unit of sale -- ranges from $100.00 to $180.00, depending upon where one is in the United States. See United Nations World Drug Report 2014 39, available at www.unodc.org/wdr2014; Steward, supra.  There are, of course, 1,000 grams in a kilogram.

What these figures mean is that an enterprising individual can conveniently buy a kilogram of cocaine for $25,500.00 -- he or she could buy it inconveniently for much less -- and then resell it on the street for $100,000.00 to $180,000.00, assuming that he or she does not cut the product at all, i.e., dilute it with an inert, low-cost filler substance.  The United Nations states that, by the time it reaches the streets, cocaine is typically only 25% to 35% pure.  See United Nations World Drug Report 2014, supra, at 37.  See also All Cut Up: Cocaine Is Cheaper, but Weaker, The Economist, available at http://www.economist.com/node/21560270.   If the individual were to cut the cocaine to a purity in the exact middle of that range, 30%, then he or she would be selling their $2,000.00 to $25,500.00 kilogram of cocaine for $333,333.33 to $600,000.00, resulting in a return on investment of $307,833.33 to $598,000.00, or 1,200% to 29,900%.

Taking risk of incarceration out of the picture, drug dealing provides a much better return on investment than almost anything else in the world economy.  This statement is true even when the individual considering the investment is a wealthy, educated individual with plenty of alternative opportunities to earn income or create wealth.  It makes drug dealing even more tempting for those individuals who do not have alternative, legal avenues for revenue production -- who are often from the inner city or rural areas, are uneducated, or have a criminal record.  To deter these individuals from engaging in this spectacularly lucrative form of crime, Congress fought a war on two fronts, which correspond to the two factors that theoretically bear on general deterrence: it increased spending on enforcement with the hope of increasing detection rate, i.e., the certainty that any given drug dealer will be caught; and it raised drug sentences to levels that, ignoring the need for deterrence, might seem draconian.  See, e.g., Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207; Executive Order 11727 (July 6, 1973)(Nixon)(establishing the Drug Enforcement Administration); After 40 Years, $1 Trillion, U.S. War on Drugs Has Failed to Meet Any of Its Goals, Associated Press (May 13, 2010), available at http://www.foxnews.com/world/2010/05/13/ap-impact-years-trillion-war-drugs-

failed-meet-goals.  Detection rates can only be raised so high, however, and harsh sentencing became, of necessity, the most prominent feature of the so-called war on drugs.  Severe sentences, it was thought, were necessary to dissuade potential offenders from seeking the jackpot-level returns of the drug trade.

Empirical evidence, however, indicates that general deterrence is effectuated more by certainty, i.e., detection rate, and celerity, i.e., the quickness of detection, and less by the severity of punishment if caught.  See United States v. Courtney, No. CR 11-2860-1, Memorandum Opinion and Order at 59 n.13 (Doc. 170)(D.N.M. Dec. 15, 2014)(Browning, J.)(discussing the disconnect between the economic model of general deterrence -- which predicts that certainty and severity are the two, coequal factors in determining a crime's general-deterrence level -- and the empirical evidence).  It seems that potential criminals consider how likely they are to get caught, and how quickly they will get caught, but not what the length of their sentence will be if and when they get caught, when deciding whether to commit a crime.  For this reason, the harsh sentencing provisions embodied by mandatory minimums and the Guidelines have failed to successfully deter much crime, and the war on drugs' legacy has largely been one of incapacitation -- preventing criminal offenses by incarcerating offenders so that they cannot reoffend -- rather than general deterrence.

The war on drugs has not been a failure, however, or at least not the complete failure that the media sometimes makes it out to be.  For example, consider the price structure of cocaine, explained in the second paragraph of this footnote.  The reason that prices are so much higher on the streets of the United States than they are in the jungles of Colombia -- i.e., the reason that Colombian drug lords allow no-name American drug dealers to reap literally 99% of their potential profits -- is that the increasing price reflects the increasing risk at each step.  It is dangerous to take drugs across international borders; customs, radar, airport screening, et cetera, all present a formidable risk of detection -- a risk for which the buyer pays if he or she wants to avoid the risk of detection at the border by buying the drugs inside the United States.  The large drug quantities at the importation stage ensure that penalties will be harsh if the international smuggler is caught, but, on the other hand, the smuggler only has to succeed once to get the kilogram of cocaine into the United States, and collect his or her fee; no repetition is needed, and the exposure is one time only.  The street-level dealer, however, must make 1,000 separate transactions to collect his fee on the kilogram, and the drastically increased profits he or she collects are reflective of the 1,000 different risk exposures he or she must undergo to unload the drugs.  The dealer can sell in quantities larger than one gram at a time, of course, but there will likely be a corresponding "bulk discount" for the buyer.

The reason that this price structure is normatively desirable, and represents a win, however modest, for the war on drugs, is that, but for the war -- both the detection-rate characteristics and the harsh sentencing -- drug prices on American streets would likely resemble those in the Colombian jungle or at the very least wholesale prices on the United States' side of the Mexican border.  The war on drugs and its severe sentencing schemes have imposed serious costs on the drug trade that natural supply-and-demand principles do not, and, as a result, countless Americans are priced out of the drug market -- partially, if not totally.  That drugs are expensive is generally a good thing, and reduces their attractiveness to both potential new users and infrequent users, and reduces their availability to addicts and budding addicts.  The bad thing about drug prices being high is that addicts commit a lot of property crime and fraud to feed their addictions, thus creating more crime in certain situations, like Valdez'.

While the sentence is a tremendous variance -- it is almost a fifty percent cut below the Guidelines range -- the Court has tried to justify the sentence as much as it can, and concludes that it avoids unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.  And because the Court is able to use supervised release when Valdez gets out of prison, the Court concludes that the conditions imposed preclude the need for a longer sentence of incarceration, and will maximize his odds of turning around his life and overcoming his drug problem.  The Court concludes that this sentence fully and effectively reflects each and every one of the factors embodied in 18 U.S.C. § 3553(a).  And while the Court's task is not, as a trial court, to come to the courtroom and come up with what it thinks is a reasonable sentence, see United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007)("'[A] district court's job is not to impose a reasonable sentence.  Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2).'"  (alteration in original)(quoting United States v. Wilms, 496 F.3d 277, 280 (6th Cir. 2007))), it is to come up with a sentence that reflects the factors that the Court has discussed.  The Court concludes that the 96-month sentence better reflects the § 3553(a) factors, and is a substantively more reasonable sentence, than the Guidelines sentence. And perhaps most important, this sentence is sufficient, without being greater than necessary, to comply with the purposes of punishment set forth in the Sentencing Reform Act.

**IT IS ORDERED** that Defendant Nestor Valdez is sentenced to 96-months imprisonment and four years of supervised release.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Damon P. Martinez
   United States Attorney
Joel R. Meyers
Cynthia L. Weisman
Shammara Henderson
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Stephen D. Aarons
Aarons Law Firm PC
Santa Fe, New Mexico

      *Attorney for the Defendant*